DENNIS BRENNAN, Petitioner, v. ILLINOIS STATE BOARD OF ELECTIONS *et al.*, Respondents.

First District (4th Division)   No. 1—01—3712

Opinion filed December 26, 2002.—Rehearing denied January 28, 2003.

James P. Nally, P.C., of Chicago (James P. Nally, of counsel), for petitioner.

James E. Ryan, Attorney General, of Chicago (Joel D. Bertocchi, Solicitor General, and Jerald S. Post, Assistant Attorney General, of counsel), for respondents.

JUSTICE KARNEZIS delivered the opinion of the court:

Petitioner Dennis Brennan (Brennan) appeals an order of the Illinois State Board of Elections (Board) that found Brennan violated various sections of the Illinois Election Code (Election Code) (10 ILCS 5/1—1 et seq. (West 2000)). Specifically, the Board found that Brennan, as well as David Zapata and the Committee to Stop the Hurckes Four, failed to comply with the Election Code's provisions relating to the disclosure of campaign contributions and expenditures. See 10 ILCS 5/9—1 et seq. (West 2000). Brennan brings this direct appeal for administrative review pursuant to section 9—22 of the Election Code, which provides for judicial review of an order of the Board directly in this court. See 10 ILCS 5/9—22 (West 2000). Respondents are the Illinois State Board of Elections, its board members, David Zapata and the Committee to Stop the Hurckes Four. On appeal, Brennan contends: (1) the Board lacked jurisdiction to enter an order more than 60 days after the filing of its complaint; (2) his due process and equal protection rights were violated; and (3) the Board's decision was against the manifest weight of the evidence. We affirm.

The Board filed a complaint against Brennan, Zapata and the Committee to Stop the Hurckes Four for violating sections 9—2 (10 ILCS 5/9—2 (West 2000)), 9—3 (10 ILCS 5/9—3 (West 2000)), 9—7 (10 ILCS 5/9—7 (West 2000)), 9—10(b—5) (10 ILCS 5/9—10(b—5) (West 2000)) and 9—26 (10 ILCS 5/9—26 (West 2000)) of the Election Code. The complaint also alleged a violation of section 100.90 (26 Ill. Adm. Code § 100.90 (2000)) of the Illinois Administrative Code.

Section 9—2 provides in part:

"No contribution and no expenditure shall be accepted or made by or on behalf of a political committee at a time when there is a

vacancy in the office of chairman or treasurer thereof. No expenditure shall be made for or on behalf of a political committee without the authorization of its chairman or treasurer, or their designated agents." 10 ILCS 5/9—2 (West 2000).

■ Section 9—3 provides in part:

"Every state political committee and every local political committee shall file with the State Board of Elections, and every local political committee shall file with the county clerk, a statement of organization within 10 business days of the creation of such committee, except any political committee created within the 30 days before an election shall file a statement of organization within 5 business days. ***

The statement of organization shall include—

(a) the name and address of the political committee (the name of the political committee must include the name of any sponsoring entity);

* * *

For purposes of this Section, a 'sponsoring entity' is (i) any person, political committee, organization, corporation, or association that contributes at least 33% of the total funding of the political committee ***." 10 ILCS 5/9—3 (West 2000).

■ Section 9—7 provides in part:

"The treasurer of a political committee shall keep a detailed and exact account of—

(a) the total of all contributions made to or for the committee;

(b) the full name and mailing address of every person making a contribution in excess of $20 and the date and amount thereof;

(c) the total of all expenditures made by or on behalf of the committee;

(d) the full name and mailing address of every person to whom any expenditure in excess of $20 is made, and the date and amount thereof;

(e) proof of payment, stating the particulars, for every expenditure in excess of $20 made by or on behalf of the committee." 10 ILCS 5/9—7 (West 2000).

■ Section 9—10(b—5) provides in part:

"[A]ny contribution of $500 or more received in the interim between the last date of the period covered by the last report filed under subsection (b) prior to the election and the date of the election shall be reported within 2 business days after its receipt." 10 ILCS 5/9—10(b—5) (West 2000).

■ Section 9—26 provides in part:

"Willful failure to file or willful filing of false or incomplete information required by this Article shall constitute a business of-

fense subject to a fine of up to $5,000." 10 ILCS 5/9—26 (West 2000).

■ Section 100.90 of the Illinois Administrative Code provides in part:

"(a) Reference: This part interprets or applies Section 9—26 of the Election Code.

(b) The State Board of Elections will view any attempt to circumvent the clear intentions of the Act by means of subterfuge as violations of the Act." 26 Ill. Adm. Code § 100.90 (2000).

The Committee to Stop the Hurckes Four was formed in February or March of 2001, by several individuals who opposed four candidates who were running for positions on the school board in Oak Lawn Community High School District 229. Those four candidates were endorsed by Jerry Hurckes. The committee produced a videotape and distributed the tape to over 7,000 residents of the school district. The tape was entitled "Protect Our Children" and recommended against supporting the four candidates endorsed by Hurckes. Residents of the school district began receiving the tape days before the April 3, 2001, election.

Brennan, a founding member of the committee, was also legal counsel for District 229. It was subsequently established that if the four candidates Hurckes endorsed were elected to the school board, Brennan would lose his contract as counsel for the school district. Brennan played a major role in the committee's activities and funded the committee's expenditures with loans from his personal funds. Specifically, Brennan loaned the committee over $12,000 to produce and mail the videotape. However, Brennan designated David Zapata to serve as the committee's chairman and treasurer. Zapata signed the committee's D-1 statement of organization on March 29, 2001, and Brennan filed the D-1 with the Board on March 30, 2001. The D-1 indicated the committee was not formed until March 26, 2001. Brennan subsequently filed an amended D-1 on April 27, 2001, naming himself as chairman and treasurer of the committee.

The Board filed its original complaint against Zapata and the Committee to Stop the Hurckes Four on May 23, 2001, alleging improper financial dealings relating to the videotape. The complaint alleged violations of sections 9—2 and 9—7. The Board believed the committee had received and spent money for the videotape before Zapata assumed office and without his authorization. The Board also believed that Zapata, as treasurer of the committee, failed to keep a detailed account of the contributions and expenditures relating to the videotape.

A closed preliminary hearing was held pursuant to section 9—21

(10 ILCS 5/9—21 (West 2000)) of the Election Code to determine whether the complaint had been filed on "justifiable grounds" such that the matter should proceed to a public hearing. Zapata received notice of the complaint and hearing, but Brennan did not. Zapata testified he signed the D-1 statement of organization at Brennan's direction, but the information on the form designating himself as chairman and treasurer was not filled in. Zapata believed that when Brennan asked him to sign the form, he was joining the committee but was unaware he would serve as the committee's chairman and treasurer. Zapata indicated Brennan never informed him he would be serving as the committee's chairman and treasurer and was also never informed of any contributions the committee received or any expenditures made on behalf of the committee.

The hearing officer concluded the complaint had been filed on justifiable grounds. Several public hearings were subsequently held at which various documents were admitted into evidence. The committee's D-1 statement of organization and amended D-1 were admitted as well as various documents the Board received as a result of serving Brennan with a subpoena. The documents from Brennan included a D-2 disclosure form that Brennan had filed on behalf of the committee on June 18, 2001. The D-2 form indicated the committee's only expenditures totaled $11,365.10, which included the cost of producing and mailing the videotape. The form also indicated the cost of the videotape totaled $10,115.50 and the cost of mailing the videotape totaled $1,249.60. It further showed that the expenditure to produce the videotape was made on March 15, 2001, and the expenditure to mail the videotape was made on March 23, 2001. The documents from Brennan also included: an invoice dated March 14, 2001, from the production company, First Light Productions, for the cost of the videotape; Brennan's check to First Light Productions, which was dated March 14, 2001, and cashed on March 16, 2001; an invoice dated March 23, 2001, from the distribution company, TC Marketing, for the cost of mailing the video; and a receipt from TC Marketing indicating the invoice had been paid on that date.

The Board filed an amended complaint on August 7, 2001, naming Brennan as an additional party. The amended complaint alleged additional violations of sections 9—3, 9—10(b—5), and 9—26 of the Election Code and section 100.90 of the Illinois Administrative Code. The Board believed Brennan violated these sections because: he failed to timely file the D-1 statement of organization; he failed to list his name as a sponsoring entity on the original and amended D-1; he failed to report the money he paid for the production and distribution of the videotape; and his actions were willful.

Brennan filed a motion to dismiss the amended complaint on the basis that it was time-barred. The motion alleged that pursuant to section 9—21 (10 ILCS 5/9—21 (West 2000)), the Board was required to render its final judgment within 60 days of the filing of a complaint. He argued that because the original complaint was filed on May 23, 2001, more than 60 days had passed and the Board no longer had jurisdiction over the matter. The hearing officer denied Brennan's motion.

At the next hearing, several additional documents were entered into evidence. These documents included: a letter from the manager of TC Marketing stating that they "dealt with Dennis Brennan in reference to anything that we needed"; a bid dated February 6, 2001, from First Light Productions estimating the cost of the videotape; and various forms from nine political committees indicating Brennan had served as either their treasurer or chairman or both over the past 10 years.

The Board called Brennan to testify as its first witness. Brennan stated that a group of individuals who opposed the Hurckes candidates first discussed establishing a committee in mid-February of 2001. Brennan entered into an agreement with First Light Productions to produce the videotape on behalf of the committee about the first or second week of March of 2001. He indicated the production of the videotape occurred soon thereafter, probably on March 12 or 13. Brennan admitted paying for the videotape with a check from his personal checking account but stated he did so at the direction of the committee. He indicated he brought a check to First Light Productions on March 15. He further stated the decision to use TC Marketing to mail the tapes was also made by the committee.

Brennan testified he first spoke with David Zapata on March 19 or 20, and asked him to serve as chairman and treasurer of the committee. It was during this phone call that he told Zapata about the expenditure for producing the videotape. Brennan first met Zapata when he had Zapata sign the D-1 statement of organization on March 29 at Zapata's office. Brennan admitted that he filled in the information on the form. Brennan also admitted he did not explain the duties of chairman or treasurer to Zapata. He stated he told Zapata about the cost of mailing the videotape during the meeting but admitted not giving Zapata the invoices or receipts from the production company or the mailing company.

Brennan further admitted serving as either chairman or treasurer or both of 9 political committees over the past 10 years. He stated he was familiar with some of the filing requirements of the Election Code but was not aware of the time frame in which a committee had to file

its D-1 statement of organization. He stated he was aware of the committee's duty to report contributions received in excess of $500 or more within two days.

Zapata's testimony was the same as his testimony from the closed preliminary hearing, except that he additionally stated Brennan told him that signing the form was simply a formality and the committee would be opened and closed on the same day. Zapata also admitted he did not perform any duties as chairman or treasurer of the committee.

Jim Nalepa, a member of the committee who appears in the videotape, testified that Brennan contacted him to serve as chairman and treasurer of the committee. Nalepa declined, instead recommending Zapata. Nalepa then asked Zapata to serve on the committee. He did not explain to Zapata the duties of chairman or treasurer. Nalepa told Zapata about the videotape the committee was producing. Nalepa also told Zapata the videotape would be sent to every voter in Oak Lawn. He characterized Brennan as the person who brought everyone together to produce the videotape. On cross-examination, Nalepa testified he advised Brennan to mail the videotape about a week-and-a-half before the election. In response to several questions by the hearing officer, Nalepa stated he was not involved in any committee meetings about the campaign or the videotape. He further stated Brennan was his only contact with the committee. He also commented that Zapata agreed to participate in the committee as a personal favor to him and noted that Zapata was a "very, very innocent bystander in all of this." The Board then rested.

Jerry Vahl, also a member of the committee, testified he served as president of the school board for District 229 since 1995. He stated the committee discussed in February of 2001 "doing something" in relation to the upcoming school board election. He was involved with the committee because he believed it would be detrimental if Hurckes' candidates gained control of the school board. On cross-examination, Vahl admitted he thought Jim Nalepa would serve as chairman of the committee because Brennan had told him. Vahl further stated that any meetings the committee held were arranged by Brennan.

Brennan testified again and stated that around March 19 or 20 of 2001, Nalepa told him he did not want to serve as chairman and treasurer, so he contacted Zapata that same day. Brennan admitted filling out the D-1 statement of organization, but stated he told Zapata that by signing the document, Zapata would be serving as chairman and treasurer of the committee. Brennan believed Zapata would file the necessary disclosure forms on behalf of the committee. Brennan also believed that when the first expenditure was made by the committee, the committee had 10 business days to file a D-1 form. Bren-

nan admitted that if the Hurckes four were elected to the school board he would lose the school board contract.

Robert Streit, a trustee for the Village of Oak Lawn, testified that he was with Brennan when Brennan had Zapata sign the D-1 statement of organization. Streit stated that Zapata read over the form and discussed the form with Brennan before signing it. At that time, Brennan also informed Zapata of an expenditure he made to TC Marketing. Brennan told Zapata the exact amount and Zapata wrote down the amount. Streit further stated that the D-1 form was already filled in before Zapata signed it.

Tony Morgando, the deputy director of campaign financing for the Board, testified that when he contacted an employee of TC Marketing to inquire about the videotape, he was told Zapata was responsible for the videotape. He also stated Brennan was not given notice of the closed preliminary hearing because, at that time, Brennan was not a party to the case.

The hearing officer issued a written report on October 5, 2001, finding that Brennan was the *"de facto"* chairman of the committee. The report also made the following findings of facts. The committee was formed as early as February 6, 2001, and no later than March 15, 2001, when Brennan paid First Light Productions. The committee and Brennan failed to report the committee within five business days of its formation. The committee and Brennan also failed to report the contributions to the committee in excess of $500 within two business days. Brennan failed to turn over to Zapata the financial receipts and proofs of payment of the transactions of the committee. Brennan filed a false D-1 statement of organization naming Zapata as the chairman and treasurer when, in fact, Brennan was the *"de facto"* chairman and treasurer. Brennan allowed the committee to accept and expend the funds at a time when the committee had vacancies in the offices of chairman and treasurer. Brennan filed a false D-1 and amended D-1 by failing to list his name as a sponsoring entity. Brennan's actions were performed with the intent to violate the Election Code. The report also found Zapata knew or should have known he had signed a document listing himself as chairman and treasurer of the committee; he had a legal obligation to inquire into the finances of the committee; he had foreknowledge that financial expenditures were intended to be made by the committee; and he might have the legal obligation to file reports.

The Board adopted the hearing officer's findings in a written order dated October 16, 2001. The order fined the committee a total of $4,200, for the various violations. The order also directed the Board's general counsel to send a copy of the order to the State's Attorney of

Cook County and to the Attorney Registration and Disciplinary Commission. Brennan appeals from the Board's order.

## I. The 60-Day Time Period

■ Brennan's first contention presents an issue of first impression. The issue is whether section 9—21 of the Election Code, which states "the Board shall render its final judgment within 60 days of the date the complaint is filed," is directory or mandatory. 10 ILCS 5/9—21 (West 2000). Does the Board lose jurisdiction over matters when it fails to render its final judgment within 60 days of the filing of a complaint?

Brennan maintains the provision is mandatory based on legislative history as well as case law. Brennan argues that the Bill that amended section 9—21 to increase the time period from 42 days to 60 days indicates the legislature's intent that the time period be construed as mandatory. Brennan also argues that when the Bill was introduced, Representative Feigenholtz stated in part "[the bill] *requires* the State Board of Elections to render a final decision of a complaint within 60 days of receipt. It's now 42 days." (Emphasis added.) 90th Ill. Gen. Assem., House Proceedings, April 24, 1997, at 57. Brennan further argues the use of the word "shall" should be interpreted as "must," citing to *Simmons v. DuBose*, 142 Ill. App. 3d 1077 (1986), and *Andrews v. Foxworthy*, 71 Ill. 2d 13 (1978).

The use of the word "shall" is generally regarded as mandatory when used in a statutory provision but can be construed as directory depending on the legislative intent. *Courtney v. County Officers Electoral Board*, 314 Ill. App. 3d 870, 873 (2000). The legislative intent can be ascertained from a consideration of the entire Act, its nature, its purpose, and the consequences that would result from interpreting the provision a specific way. *People ex rel. Meyer v. Kerner*, 35 Ill. 2d 33, 39 (1966). When a statute specifies a penalty for failing to comply with its provisions, it will be construed as mandatory rather than directory. *Simmons*, 142 Ill. App. 3d at 1080. Conversely, when a statute provides no penalty for noncompliance, courts will construe it as directory. *Maske v. Kane County Officers Electoral Board*, 234 Ill. App. 3d 508, 515 (1992). We review an agency's conclusions of law *de novo*. *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 205 (1998).

We conclude the 60-day time period in section 9—21 should be construed as directory rather than mandatory. First, the nature and purpose of the Election Code are to ensure fair elections by requiring political committees to disclose their contributions and expenditures. These goals would be frustrated if the Board's jurisdiction was limited

to rendering a final judgment within 60 days, especially in a case such as this where lengthy discovery was necessary to reveal those individuals responsible for the violations. Brennan's argument that the provision is mandatory because the bill was introduced as "requir[ing]" the Board to reach a decision within 60 days does not outweigh our determination that the nature and purpose of the Act would be frustrated if it were construed as mandatory.

Second is the absence of a penalty if the Board fails to comply with the 60-day provision. The statue could have provided the Board would lose jurisdiction after 60 days; however, the legislature chose not to do so. The fact the provision was increased from 42 days to 60 days does not lead us to conclude the Board loses jurisdiction after 60 days.

Third, Brennan's reliance on *Simmons* and *Andrews* supports the conclusion the 60-day time period should be construed as directory. In *Simmons*, this court considered whether the 90-day time period in section 7—10 of the Election Code (10 ILCS 5/7—10 (West 2000)) was directory or mandatory. That section provided "nominating petitions must be circulated no more than 90 days prior to the deadline for filing such petitions." 10 ILCS 5/7—10 (West 2000); see *Simmons*, 142 Ill. App. 3d at 1079. The provision also stated "the name of a candidate shall not appear on the ballot if the requirements for filing nominating petitions are not satisfied." 10 ILCS 5/7—10 (West 2000); see *Simmons*, 142 Ill. App. 3d at 1080. In concluding the provision was mandatory, this court reasoned that "[w]hen a statute specifies what result will ensue if its terms are not complied with, then the statute is deemed mandatory." *Simmons*, 142 Ill. App. 3d at 1080. Because section 7—10 provided a penalty for noncompliance, it was construed as mandatory. *Simmons*, 142 Ill. App. 3d at 1080.

In *Andrews*, our supreme court stated:

"[W]hen a statute prescribes the performance of an act by a public official or a public body, the question of whether it is mandatory or directory depends on its purpose. If the provision merely directs a manner of conduct for the guidance of the officials or specifies the time for the performance of an official duty, it is directory, absent negative language denying the performance after the specified time. If, however, the conduct is prescribed in order to safeguard someone's rights, which may be injuriously affected by failure to act within the specified time, the statute is mandatory." *Andrews*, 71 Ill. 2d at 21.

Applying the reasoning and conclusions set forth in both *Simmons* and *Andrews* to the facts in this case, the 60-day time period should be construed as directory because there is no penalty for failing to

comply with the provision. Also, there is nothing to suggest Brennan's rights were adversely affected by the Board's failure to enter a final judgment within 60 days. The Board's judgment was rendered only 70 days after the amended complaint was filed and about 120 days after the original complaint was filed.

## II. Due Process and Equal Protection

Brennan next contends his due process and equal protection rights were violated because the original and amended complaints were insufficient and he did not receive notice of the original complaint or the closed preliminary hearing. He argues that both the original complaint and the amended complaint should be dismissed for failure to comply with the statutory requirements in section 9—20 of the Election Code (10 ILCS 5/9—20 (West 2000)) because they did not identify what reports the committee failed to file and what liabilities Brennan had incurred for failing to timely file the reports.

■ Section 9—20 of the Election Code provides that a complaint shall: be in writing; state the name of the candidate or chairman or treasurer of a political committee against whom it is directed; state the statutory provisions alleged to have been violated; and state the time, place and nature of the alleged offense. 10 ILCS 5/9—20 (West 2000).

■ We disagree with Brennan's contention and conclude that both the original and amended complaints complied with the provisions in section 9—20. The original complaint stated the nature of the offense as "[i]n relation to the cost associated with the video entitled 'Protect Our Children,' the treasurer of the political committee, Mr. David Zapata, failed to comply with the record-keeping requirements as provided in [sic] statute." The amended complaint adding Brennan stated the nature of the offense as "willful circumvention to file reports in an accurate and timely fashion." Both complaints also alleged which sections of the Election Code the Board believed had been violated. The complaints contain the specified information set forth in section 9—20. Also, the complaints were not, as Brennan suggests, required to state what specific reports the committee failed to file and what liabilities Brennan might incur for failing to file those reports.

Brennan also argues his rights were violated when he did not receive notice of the original complaint or an opportunity to participate in the closed preliminary hearing.

■ Section 9—21 of the Election Code states in part:

"[T]he Board shall hold a closed preliminary hearing to determine whether or not the complaint appears to have been filed on justifiable grounds. Such closed preliminary hearing shall be conducted

as soon as practicable after affording reasonable notice, a copy of the complaint, and an opportunity to testify at such hearing to both the person making the complaint and the person against whom the complaint is directed. If the Board determines that the complaint has not been filed on justifiable grounds, it shall dismiss the complaint without further hearing.

Whenever in the judgment of the Board, after affording due notice and an opportunity for a public hearing, any person has engaged or is about to engage in an act or practice which constitutes or will constitute a violation of any provision of this Article or any regulation or order issued thereunder, the Board shall issue an order directing such person to take such action as the Board determines may be necessary in the public interest to correct the violation." 10 ILCS 5/9—21 (West 2000).

As stated above, the purpose of a closed preliminary hearing is for the Board to determine whether the complaint was filed on justifiable grounds, while giving each party an opportunity to present its arguments. Once the Board has determined the complaint was filed on justifiable grounds, the matter proceeds to a public hearing, where again, due notice is required before a final judgment may be entered.

■ Here, we find the Board proceeded properly according to the provisions in section 9—21. The original complaint only named Zapata and the committee because the Board was investigating violations that occurred prior to Brennan's amended D-1 naming himself as chairman and treasurer. After the Board determined the complaint was filed on justifiable grounds, there were several public hearings in which the Board informed the hearing officer it was proceeding with discovery. Brennan was notified of neither the original complaint nor of the initial public hearings because the Board still believed the alleged violations occurred before Brennan's service as chairman and treasurer of the committee. This is supported by Morgando's testimony that when Morgando called the company that produced the videotape, an employee informed him Zapata was responsible for the videotape. After the Board learned the extent of Brennan's involvement in the committee, Brennan was served with an amended complaint and given notice of all subsequent public hearings. After Brennan's motion to dismiss was denied, the matter proceeded to the public hearing that resulted in the committee being assessed the fines. According to section 9—21, due notice and an opportunity for a public hearing are all that is required. Section 9—21 does not provide for multiple preliminary hearings. It simply states that if the complaint has been filed on justifiable grounds, the matter proceeds to a public hearing. Brennan was certainly provided with a public hearing and notice of

the hearing. Further, although Brennan argues he was never afforded a closed hearing, he never requested one.

■ Brennan also argues the Board's charge of "willful circumvention" as set forth in section 9—26 of the Election Code "cannot stand where no legal definition exists to support the claim." He maintains the charge is "vague and undefined" and cannot form the basis of a claim against him. However, because Brennan cites to no supporting authority, his argument is waived. See *McCarthy v. Denkovski*, 301 Ill. App. 3d 69, 74-75 (1998); 188 Ill. 2d R. 341(e)(7).

### III. The Hearing Officer's Findings

Lastly, Brennan contends the hearing officer's findings are against the manifest weight of the evidence. He also argues the evidence does not support the finding that his actions were willful.

■ An administrative agency's decisions on questions of fact are entitled to deference and are reversed only if against the manifest weight of the evidence. An agency's decision cannot be said to be against the manifest weight of the evidence unless it appears from the record that the opposite conclusion is clearly evident. *McHenry v. City of East St. Louis*, 210 Ill. App. 3d 861, 864 (1991).

■ Here, we find the hearing officer's findings of fact are supported by the record. The evidence indicates that Brennan formed the committee to allow him to campaign against the Hurckes Four while concealing his identity. Brennan organized and funded the committee's activities from beginning to end and, essentially, *was* the committee. This is supported by the following findings. Brennan asked Jim Nalepa to serve as chairman and treasurer. Brennan solicited and accepted the bid to produce the videotape. Brennan hired the distribution company to mail the videotape. Brennan funded the committee's activities with money from his personal checking account. Brennan spent money on behalf of the committee when there was a vacancy in the offices of chairman and treasurer. Brennan called Zapata to participate in the committee. Brennan brought Zapata the D-1 statement of organization to sign. Brennan filled in the D-1, which contained an untrue statement that the committee was not created until March 26, 2001. Brennan failed to timely file the D-1. Brennan failed to include himself on the original D-1 and the amended D-1 as a sponsoring entity. Brennan filed both forms with the Board knowing they either contained false information or failed to include required information. And, Brennan failed to provide Zapata with the invoices or receipts of the committee's contributions and expenditures.

The record supports the conclusion that section 9—2 was violated. As stated previously, section 9—2 prohibits expenditures when there is

a vacancy in the office of chairman or treasurer and prohibits expenditures without the treasurer's authorization. Brennan caused the committee to pay for the production and distribution of the videotape prior to Zapata taking office and without his authorization. Zapata signed the D-1 statement of organization on March 29, 2001, whereas Brennan's check to the production company was cashed on March 16, 2001, and the invoice from the distribution company dated March 23, 2001, indicated they had been paid on that date. These expenditures were done prior to Zapata signing the D-1 statement and also were done without his authorization.

The record supports the conclusion that section 9—3 was violated. Section 9—3 provides that a committee must file a D-1 statement of organization within 10 business days of its creation, except any committee created within 30 days before an election must file a statement within five business days. It further provides that the D-1 statement of organization must include the name of any sponsoring entity. Brennan testified that the committee discussed producing a videotape as early as mid-February of 2001. If we were to find the committee was created as of that date, then we can conclude that Brennan failed to file the D-1 within 10 business days. Brennan also testified that he delivered a check to the production company on March 15, 2001. If we were to find the committee was created as of that later date, then Brennan still failed to timely file the D-1 form. Because March 15, 2001, would have been within 30 days before the April 3, 2001, election, Brennan had 5 days to file the D-1 form. He failed to do so. Section 9—3 was also violated because Brennan failed to include his name as a sponsoring entity on both the original and amended D-1 forms. He not only contributed 33% of the committee's funds, but contributed the committee's entire funding.

The record supports the finding that section 9—7 was violated. That section requires the treasurer to keep a detailed and exact account of the committee's contributions and expenditures. Although Zapata became the named treasurer as of March 29, 2001, the committee's contributions and expenditures occurred before Zapata became treasurer. Brennan, who made the contributions and expenditures for the committee, admitted that he failed to provide Zapata with the invoices and receipts from these transactions. Brennan is not, as he argues, being held responsible for Zapata's actions as treasurer because Brennan subsequently became the named treasurer of record, but because he failed to permit Zapata to keep detailed records when Zapata became treasurer.

The record supports the conclusion that section 9—10(b—5) was violated. Section 9—10(b—5) requires the committee to report any

contribution of $500 or more within two business days. After Brennan delivered his check to First Light Productions, the committee had two business days to report the contribution. After the mailing company was paid, the committee had two business days to report that contribution. Brennan failed to do so. He did not report either contribution until he filed the D-2 statement of disclosure on June 18, 2001.

The record supports the finding that section 9—26 was violated. That section provides that the "willful" failure to file or the "willful" filing of false or incomplete information constitutes a business offense. Section 100.90 of the Illinois Administrative Code, which interprets section 9—26, provides the Board will view any attempt to circumvent the clear intentions of the Election Code by means of subterfuge as a violation of the Election Code. We disagree with Brennan and conclude that Brennan's actions can only be construed as willful and also that he purposely intended to circumvent the filing requirements of the Election Code by naming Zapata as chairman and treasurer to conceal his identity. Brennan admitted filling in the D-1 form which contained a false date as to when the committee was created. Brennan also failed to include his name as a sponsoring entity both in the original D-1 statement of organization and in the amended D-1 statement. He also named Zapata as chairman and treasurer even though he really acted as chairman and treasurer of the committee. Most damaging to Brennan's argument that his actions were not willful is the fact that he served as chairman or treasurer or both of nine political committees over the last 10 years. We can only infer from this fact that Brennan was certainly familiar with the reporting and disclosure requirements of the Election Code and his actions in disregarding these requirements were willful.

Accordingly, the judgment of the Board is affirmed.

Affirmed.

HARTMAN and GREIMAN, JJ., concur.