FOURTH DIVISION
MARCH 15, 2007

No. 1-05-1950

| | | |
|---|---|---|
| VICTOR SANTANA, | ) | On Review from |
| | ) | an Order of the Illinois |
| Petitioner-Appellant, | ) | State Board of Elections. |
| | ) | |
| v. | ) | |
| | ) | |
| THE STATE BOARD OF ELECTIONS, | ) | |
| its members JOHN R. KEITH, JESSE SMART, | ) | No. 04 CD 038 |
| WANDA L. REDNOUR, ELAINE ROUPAS, | ) | |
| WILLIAM M. McGUFFAGE, DAVID E. MURRAY, | ) | |
| ALBERT PORTER, BRYAN A. SCHNEIDER, | ) | |
| and its Executive Director, DANIEL WHITE, | ) | |
| and SCOTT SAEWERT, | ) | |
| | ) | |
| Respondents-Appellees. | ) | |

JUSTICE CAMPBELL delivered the opinion of the court:

Petitioner, Victor Santana, appeals from the decision of the Illinois State Board of

Elections (Board) finding that he violated multiple sections of the Illinois Election Code. See 10

ILCS 5/1-1, *et seq*. (West 2004). The Board acted on the complaint of respondent Scott Saewert,

who filed a complaint alleging that Santana violated the Election Code in connection with the

printing and mailing of campaign literature pertaining to the primary election in Wheeling

Township, Illinois, in March 2004. The Board and Saewert filed separate response briefs;

Saewert adopts the majority of the content of the Board's brief. We review this administrative

order of the Board directly, pursuant to section 9-22 of the Election Code. 10 ILCS 5/9-22 (West

2004).

On appeal, Santana contends that: (1) the Board incorrectly concluded that Santana is a political committee required to file campaign financing reports; and (2) the Board's decision is deficient for failure to thoroughly consider the record. For the following reasons, we affirm the order of the Board.

BACKGROUND

The record on appeal contains the following relevant facts. Saewert is the committeeman of the Republicans of Wheeling Township (RWT) as well as the highway commissioner of Wheeling Township. Wheeling Township is comprised of the municipalities of Wheeling, Arlington Heights, portions of Buffalo Grove, Mount Prospect, Des Plaines, and Rolling Meadows, all located northwest of the City of Chicago. In its capacity as official local organization of the state Republican Party, the RWT reviews the candidates in primary and general elections and chooses and endorses its candidates. As committeeman, Saewert participates in making endorsements that are sometimes communicated to voters via direct mail advertising.

According to Saewert's complaint, in March 2004, Wheeling Township experienced a "hotly contested and well-financed" three-way primary campaign for judge of the circuit court of Cook County, Twelfth Judicial Subcircuit. Saewert and the RWT endorsed candidate Kay Marie Hanlon and, in support of Hanlon, authorized, produced and mailed to Wheeling Township voters several days before election day a yellow, black and white "sample ballot" highlighting Hanlon's race for the Twelfth Subcircuit race, and also urging voters to support other local, state and national candidates.

At the time the sample ballot was distributed, Saewert learned that a different but similar-looking sample ballot arrived in the mailboxes of Wheeling Township voters. This alternative sample ballot was also yellow, black and white in color. The non-RWT sample ballot (Bubaris

Ballot) purported to endorse the candidacy of Hanlon's rival for the Twelfth Subcircuit judicial race, Athena Frentzas Bubaris. Saewert's name (misspelled as "Saew*a*rt") and home address appeared as the return address on the Bubaris Ballot, as describing Saewert's title as committeeman of an organization called the "Regular Republican Organization of Wheeling Township," a group Saewert asserted does not exist.

The Bubaris Ballot purported to originate from the Regular Republican Organization of Elk Grove Township, despite the prominent display of Saewert's name and mention of the Wheeling Republican organization. The Regular Republican Organization of Elk Grove Township, an existing political group, did not commission the Bubaris Ballot.

As a result of the competing sample ballots, voter confusion ensued in the Wheeling Township precincts. Saewert testified that he received many telephone calls from residents involved in Republican politics in Wheeling Township who were baffled over the apparently conflicting endorsements.

Saewert filed an initial complaint with the Board. Saewert's complaint led to an investigation which ultimately identified Santana as the individual who placed an order and paid for the printing of the Bubaris Ballot. On July 15, 2004, Saewert filed a formal complaint alleging that Santana violated sections 9-3, 9-9.5, and 9-10 of the Election Code pertaining to the registration and reporting of political committees. In a closed preliminary hearing, the Board determined that the complaint was filed on justifiable grounds and ordered a public hearing.

A public hearing commenced before a hearing officer on October 15, 2004. Saewert testified at the hearing and introduced eight exhibits into evidence. Santana testified and introduced only his own affidavit as an exhibit. Two witnesses testified on Saewert's behalf, Paul Bubaris, the husband of candidate Athena Frentzas Bubaris, and Kurt Ricker, the owner of

Mailing Concept Solutions, Tinley Park, the company that produced the Bubaris Ballot. Santana questioned Ricker, but called no witnesses on his behalf.

Santana testified that he has worked on state, local and national political campaigns for Republican candidates for over 22 years, as both a consultant and campaign manager.[1] In March 2004, Santana assisted the primary campaign of Athena Frentzas Bubaris, as a "volunteer." Santana created a sample ballot promoting Athena Frentzas Bubaris at the direction of Paul Bubaris and provided information to AllMedia Print Solutions. Santana stated that the sample ballot was to be mailed to voters in Elk Grove Township just before the day of the primary election, as Athena Frentzas Bubaris was the endorsed candidate of the Republican organization in Elk Grove Township.

Santana testified that he had "no idea" how his sample ballot came to feature Saewert's name and home address rather than Santana's name, or the name of the Bubaris campaign, nor could he account for how the sample ballot was mailed to voters in Wheeling Township. Santana reviewed mailings for Hanover[2] and Elk Grove Townships and did not see actual proof of mailing to Wheeling Township. Santana speculated that the printing company representatives

---

[1]Santana was the defendant in the unpublished Supreme Court Rule 23 disposition Olszewski v. Santana, No. 1-02-2498 (July 20, 2004), which addressed Santana's participation in the publication and distribution of defamatory political communication, including a brochure known as "Liar Liar," in connection with the March 17, 1998, Republican primary race for Cook County Board commissioner.

[2]Santana testified that the Hanover mailing was a separate and different mailing.

consulted with websites of local political organizations to determine the appropriate committeemen and their corresponding addresses.

Santana testified that the total amount he paid for the Bubaris mailing was $3500. He met Alan Drazek of AllMedia at Portillo's restaurant on Harlem Avenue in Chicago and paid Drazek in two cash installments, remitting about $2,200 "the first day," and the remainder the next day. Santana stated the order was for "two jobs," one for Wheeling and one for Hanover. Santana indicated that these activities occurred "pretty close to the election," and that "we had to get the postage and put it in the mail." Santana stated that he never received a copy of the bill for printing services.

Paul Bubaris testified that he and Santana were good friends and had known each other for 15 years. Bubaris stated that he spoke with Santana about the Twelfth Judicial Subcircuit judgeship race every day during the campaign. Bubaris told Santana that he wanted to raise his wife's profile in Elk Grove Township, where she was the endorsed candidate, by highlighting her candidacy in a sample ballot listing her race in addition to the other contested races from state representative up to the presidency. In fact, at that time, Elk Grove Township voters had already received a sample ballot from the Regular Republican Organization of Elk Grove Township backing Athena Frentzas Bubaris' candidacy.

Bubaris testified Santana agreed to be responsible for the second mailer. Bubaris and Santana decided that the mailer should be mailed to voters in Elk Grove Township. Bubaris disclaimed either any personal responsibility or any culpability on the part of the campaign for the mailer targeting voters in Wheeling Township because that was not what he wanted or expected.

Ricker testified that his company, Mailing Concepts, produced the Bubaris Ballot mailer in conjunction with the graphics and printing firm, AllMedia Print Solutions, based on content provided by Santana. Ricker showed an invoice for the job completed on March 9, 2004, in the amount of $4,648, and stated that Santana paid cash for the mailer project.

The hearing officer issued a report and recommendations sometime late 2004.[3] The Hearing Officer made finding of fact that Santana worked "as a volunteer for Athena Frentzas Bubaris" and "on behalf of" the Hanover Organization of Republicans. The hearing officer found that Santana spent in excess of $3,000, for a total of $4,648. The hearing officer found that Santana: "did not receive any reimbursement from the Citizens for Athena Frentzas Bubaris or the Hanover Organization of Republicans because the sample ballots were mailed late, contained errors and, in the case of Citizens for Athena Frentzas Bubaris, [were] sent to the wrong voters."

The hearing officer concluded that once Santana learned that neither the Hanover Organization nor the Citizens for Athena Bubaris would reimburse him for the $4,648 paid for the Wheeling Ballot and other mailers, he became a "local political committee" and was obligated to file a statement of organization and disclose the money expended. The hearing officer found that Santana violated several provisions of the Election Code, assessed a penalty against Santana in the amount of $4,648, and ordered Santana to file all required organizational and financial reports by December 31, 2004. Santana filed several of the required reports on December 30, 2004.

On December 3, 2004, the Board voted to adopt the recommendations of the hearing officer. In early 2005, the Board met several times to discuss the case. On February 25, 2005,

---

[3]The report of the hearing examiner is undated in the record on appeal.

the Board granted Santana's motion for a rehearing.. On May 23, 2005, the Board issued its final order. Therein, the Board found as follows:

"1. The Respondent violated 10 ILCS 5/9-3 and 5/9-10 in that the Respondent spent $4648.00 to support a candidate for public office but did not file a D-1 Statement of Organization, a Schedule A-1, a March 2004 Pre-Election Report of Campaign Contributions, or a June 2004 Semi-Annual Report of Campaign Contributions and Expenditures in a timely manner; and

2. The Respondent also violated 10 ILCS 5/9-9.5 by failing to attach the required attribution of source to distributed political materials***."

The Board assessed a penalty against Santana in the amount of $4,648; referred the matter to the office of the Cook County State's Attorney for review; and denied Santana's petition reconsideration of its final order on June 16, 2005. Santana filed this timely appeal from the Board's orders of May 23, 2005, and June 16, 2005.

OPINION

On appeal, Santana initially contends that the Board incorrectly determined that he is a political party subject to the sections 9-3, 9-9.5 and 9-10 of the Election Code. 10 ILCS 5/9-3, 9-9.5, 9-10 (West 2004). Santana argues that the evidence at the hearing revealed that he was working for established political committees and therefore did not constitute a political party subject to the above provisions of the Code.

This court reviews the decision of an administrative body as a "mixed question of law and fact," on a "clearly erroneous" standard. AFM Messenger Service, Inc. v. Department of

Employment Security, 198 Ill. 2d 380, 763 N.E.2d 272 (2001); City of Belvidere v. Illinois State

Labor Relations Board, 181 Ill. 2d 191, 692 N.E.2d 295 (1998).  A mixed question of law and

fact involves an analysis of the application of the rule of law to the established facts; the ultimate

determination is whether the rule of law is violated.  AFM Messenger, 198 Ill. 2d at 391, 763

N.E.2d at 279.  The "clearly erroneous" standard is "significantly deferential" to administrative

decisions and requires that an agency's determination will be reversed "only where the reviewing

court, on the entire record, is 'left with the definite and firm conviction that a mistake has been

committed' "  AFM Messenger, 198 Ill. 2d at 394, 763 N.E.2d at 281 (quoting United States v.

United States Gypsum Co., 333 U.S. 364, 395, 92 L. Ed. 746, 766, 68 S. Ct. 525, 542 (1948)).

The decision of an election board is subject to such deference.  Bonaguro v. County Officers

Electoral Board, 158 Ill. 2d 391, 634 N.E.2d 712 (1994).

The requirements for the formation of a political committee is detailed in section 9-3 of

the Election Code, which provides in pertinent part as follows:

"§ 9-3.  Every state political committee and every local

political committee shall file with the State Board of Elections ***

a statement of organization within 10 business days of the creation

of such committee, except any political committee created within

the 30 days before an election shall file a statement of organization

within 5 business days.

***

The statement of organization shall include -

(a) the name an address of the political committee (the

name of the political committee must include the name of any

sponsoring entity);

***

For purposes of this Section, a 'sponsoring entity' is (i) any

person, political committee, organization, corporation, or

association that contributes at least 33% of the total funding of the

political committee *** ."  10 ILCS 5/9-3 (West 2004).

This court analyzed and applied section 9-3 in Brennan v. Illinois State Board of

Elections, 336 Ill. App. 3d 749, 764, 784 N.E.2d 854, 866 (2002).  The record there revealed that

in mid-February 2001, Dennis Brennan formed a political committee to oppose four candidates

running for election to the Oak Lawn school board.  Brennan financed the committee through

personal loans and named David Zapata to serve as the committee's chairman and treasurer.  The

committee produced a videotaped negative campaign advertisement against the four candidates

and anonymously distributed the tape to more than 7,000 residents of the school district prior to

the April 3, 2001, election.  Brennan filed a statement of organization on March 29, 2001,

indicating that the committee was not formed until March 26, 2001.  On April 27, 2001, Brennan

filed an amended statement naming himself as chairman and treasurer of the committee.

Brennan, 336 Ill. App. 3d at 754.

The Board filed a complaint against Zapata and the committee alleging improper dealings

relating to the videotape and violations of section 9-3, which requires that, as quoted above, a

political committee formed within 30 days of an election file a statement of organization with the

Board within five days of creation.  Brennan, 336 Ill. App. 3d at 764.  This court held that the

creation date of a political committee can be traced to, at the earliest, the initial strategic political discussions, and, at the latest, the time the committee procures political paraphernalia through payment. <u>Brennan</u>, 336 Ill. App. 3d at 764.

Santana contends that "the uncontroverted evidence" at the hearing revealed that he was acting as a volunteer for and agent of the Bubaris campaign and the Hanover Republicans for the purposes of the two separate mailings. Santana argues that he expected to be reimbursed for his expenditures associated with the Bubaris Ballot, but had not yet been reimbursed at the time of the hearing, and that "the record is not clear as to when – pre or post-election" he was "supposed to have found out that the recognized political committees would not pay for the expenditures," nor is it clear at what point he, in fact, became a political committee. Santana argues that AllMedia was responsible for the errors in the printing and mailing of the Bubaris Ballot; that the errors were not his fault; that he spent under $3,000; and that the Board made no finding of wilfulness against him. Santana's further argues that he could not have become a political committee until the moment he realized he would not be reimbursed $4,648, in printing and mailing expenses.

Santana's argument is wholly without merit. Nothing in the language of section 9-3 provides a waiver of the filing requirement on the anticipation of repayment of expenses. Section 9-3 clearly provides, as clearly interpreted in <u>Brennan</u>, that a political committee is formed by the simple conduct of the actors involved in its formation. 10 ILCS 5/9-3 (West 2004). The hearing testimony in the present case reveals that Santana formed a political committee prior to the primary election as early as the time he placed the order for the Bubaris Ballot materials, March 9, 2004. Further evidence of the formation of a political committee is

shown by Santana's cash payment for the Bubaris Ballot materials in two consecutive meetings at a Portillo's restaurant shortly afterwards.

Santana's next contention, that he was not a political committee because he spent less than the threshold of $3,000 on political materials for two different projects, one for Elk Grove and one for Hanover Park, is unavailing. The record shows that the Bubaris Ballot, which Santana alleged was intended for Elk Grove Township, contained endorsements for political offices exclusive to Wheeling Township and the name (albeit misspelled) and home address of Scott Saewert, who resides in Wheeling Township. The record also shows that Santana paid for all of the mailings for a total amount of $4,648.

A political committee is defined in section 9-1.8 of the Election Code as follows:

"[T]he candidate himself or any individual, trust, partnership, committee, association, corporation, or any other organization or group of persons which -

(a) accepts contributions or grants or makes expenditures during any 12-month period in an aggregate amount exceeding $3,000 on behalf of or in opposition to a candidate or candidates for public office who are required by the Illinois Governmental Ethics Act *** to file statements of economic interests with the Secretary of State [or]

***

(d) accepts contributions or makes expenditures during any 12-month period in an aggregate amount exceeding $3,000 for electioneering communications relating to any candidate or

candidates described in paragraph (a) ***."  10 ILCS 5/9-1.8 (West 2004).

Santana's own testimony reveals that he satisfied the transactional requirements for the definition of a political committee under section 9-1.8.  Notwithstanding Santana's testimony that he paid the invoice in two installments, the invoice does not indicate two separate jobs.  Rather, the invoice for $4,648 states the total amount due for the printing, processing and mailing of 13,000 "Wheeling Township SAMPLE BALLOTS."  The invoice is stamped "PAID" with a notation that payment was made in "cash."  Thus the record shows that Santana made expenditures "in an aggregate amount exceeding $3,000" either on "behalf of or in opposition to a candidate or candidates for public office" related to "electioneering communications."

Moreover, Santana, in fact, became a political committee on March 1, 2004, the date Santana entered as the creation date of  "Citizens In Action" (CIA), upon filing a statement of organization with the Board on December 30, 2004.  Santana testified that he filed a D-2 semi-annual report wherein he stated that he made contributions to CIA, his political committee, in the amount of $3,500, and then made $3,500 in payments to Mailing Concept Solutions on March 9, 2004.

Thus, the Board correctly found that Santana became a political committee pursuant to section 9-3 "no later than March 9, 2004," the date of the invoice for the Bubaris Ballots.

Santana further disputes the Board's finding that he violated section 9-9.5. In support, Santana argues:  (1) he was acting as an agent for political principals who were responsible for compliance with the disclosure requirement; (2) the Board was bound to accept the testimony witnesses at the public hearing; (3) the Board is bound by the report of the hearing officer; and

(4) since he was not a political committee pursuant to section 9-3 at the time he placed the order for the Bubaris Ballot materials, he could not have violated section 9-9.5.

Section 9-9.5 of the Election Code provides:

> "§ 9-9.5. Disclosures in political communications. Any political committee, organized under the Election Code, that makes an expenditure for a pamphlet, circular, handbill, Internet communication, radio, television, or print advertisement, or other communication directed at voters and mentioning the name of a candidate in the next upcoming election shall ensure that the name of the political committee paying for any part of the communication, including, but not limited to, its preparation and distribution, is identified clearly within the communication as the payor." 10 ILCS 5/9-9.5 (West 2004).

Initially, Santana argues that he was not subject to the 9-9.5 disclosure requirement because in procuring the Bubaris Ballot materials, he was acting as an agent for the established political committees "Citizens for Athena Bubaris" and "Hanover Organization of Republicans." Santana provides no authority for this contention and it is therefore waived for review. 188 Ill. 2d R. 341(e)(7); Brennan, 336 Ill. App. 3d at 763, 784 N.E.2d at 865.

Even if not waived, Santana has not established the existence of an agency relationship. An agency is a fiduciary relationship  in which the principal has the right to control the agent's conduct and the agent has the power to act on the principal's behalf. Amigo's Inn, Inc. v. License Appeal Comm'n, 354 Ill. App. 3d 959, 965, 822 N.E.2d 107, 113 (2004).  Generally, the question of whether an agency relationship exists and the scope of the purported agent's authority are

questions of fact. Progress Printing Corp. v. Jane Byrne Political Committee, 235 Ill. App. 3d 292, 601 N.E.2d 1055 (1992). A principal-agent relationship exists when the principal has the right to control the manner in which the agent performs his work and the agent has the ability to subject the principal to personal liability. Amigo's Inn, 354 Ill. App. 3d at 965, citing Lang v. Silva, 306 Ill. App. 3d 960, 972, 715 N.E.2d 708, 716 (1999).

Here, the record reveals that Santana was not employed by the Bubaris campaign; Santana described himself as a "volunteer." The record further reveals that neither Paul Bubaris, Citizens for Athena Bubaris nor the Hanover Organization of Republicans controlled the manner and method by which Santana produced and obtained the Bubaris Ballot. Moreover, Paul Bubaris testified that the Bubaris campaign had no involvement in the mailing. Finally, the mailing, supposedly designed to reach the voters of Elk Grove Township, mysteriously sported the incorrectly spelled name and home address of Saewert, the Committeeman of Wheeling Township, as if inserted by an occult hand. In light of this evidence, Santana cannot establish that he was an agent for any principal or that his work procuring the Bubaris Ballot fell within the scope of any purported authority.

Santana further contends that the Board was bound to accept the testimony of witnesses at the public hearing. Santana argues that a trier of fact in an administrative hearing may not reject the testimony of a witness unless the testimony is inherently improbably or the witness has been impeached. People ex rel. Brown v. Baker, 88 Ill. 2d 81, 85, 430 N.E.2d 1126 (1981); and Terrano v. Retirement Board of Policemen's Annuity and Benefit Fund, 315 Ill. App. 3d 270, 733 N.E.2d 905 (2000).

Santana's contention is unsupported by any citation to evidence in the record as to which witness and what testimony was improperly rejected by the hearing officer. A mere contention

unsupported by argument "do[es] not merit consideration on appeal." Elder v. Bryant, 324 Ill. App. 3d 526, 533, 755 N.E.2d 515, 522 (2001). Santana has therefore waived this issue on review.

Next, Santana argues that the Board is bound by the report of the hearing officer, who, Santana contends, did not find a violation of section 9-9.5 "because of the uncertainty as to when Santana became a 'political committee.' " Santana again fails to elaborate on the details of the Board's allegedly erroneous finding. Nevertheless, the Board is not required to defer to the findings of a hearing officer, including any determinations the hearing officer might make about the credibility of witnesses. Hearne v. Chicago School Reform Board, 322 Ill. App. 3d 467, 479, 749 N.E.2d 411, 422 (2001). As stated above, on administrative review of an agency action, this court reviews the finding of the Board's order on a clearly erroneous standard. AFM Messenger, 198 Ill. 2d at 395, 763 N.E.2d at 281. Santana has failed to show that the Board's finding that he became a political committee prior to the March 2004 primary election was clearly erroneous.

Santana further argues that since he was not a political committee at the time he placed the order for the Bubaris Ballot materials, he could not have violated the disclosure requirement of section 9-9.5. Santana's argument is unsupported by the record. As detailed above, the record, including Santana's own testimony, supports the Board's finding that he became a political committee subject to the disclosure requirements of section 9-9.5 as early as the time he decided to create the Bubaris Ballot. The record further shows that by failing to comply with the provisions of section 9-9.5, Santana created voter confusion by placing Scott Saewert's name and home address on the Bubaris Ballot. We find no error in the Board's conclusion.

Santana additionally contends that the Board's finding that he violated section 9-10 of the Election Code by failing to file certain financial reports was clearly erroneous. Section 9-10

of the Election Code, "Financial reports" (10 ILCS 5/9-10 (West 2004)), contains the requirements for the filing of campaign financing reports, including reports of campaign contributions (section 9-10(b)); a semi-annual report (section 9-10(c)); and a report of "any contributions of more than $500" made between the last-submitted report and the date of the election (section 9-10(b-5), also referred to as "Schedule A-1"). Santana argues that the Board did not make a finding as to "which part of Section 9-10" he violated and that the Board's decision was erroneously premised on its erroneous finding that Santana was a political committee.

Santana asserts that the Board improperly determined that he had some sort of "de facto" status as a political committee, as was the determination by the Board in Brennan. Santana distinguishes Brennan, explaining that unlike the present case, the petitioner Brennan, an attorney, had served as chairman or treasurer of nine different political committees in the 10 years preceding that case, actually formed and ran the committee at issue, including personally funding its activities, arranging for Zapata to sign the required D-1 forms, and filing those forms with false information regarding the genesis of the committee activities. Brennan, 336 Ill. App. 3d at 763-65.

Contrary to Santana's argument, the present case is, in fact, similar to Brennan on the facts detailed herein. Santana exhibited indicia of a political committee by producing and procuring campaign literature, paying for such materials with his own cash funds, and ensuring its dissemination. Based on the evidence at the hearing, the Board concluded that Santana violated all of the financial reporting requirements of section 9-10 and we cannot conclude that the Board's finding was in error.

Finally, Santana contends that the Board's decision is "woefully inadequate" for failure either to cite to the record or to refer to the hearing officer's report. Santana argues that the

hearing officer "left open a crucial factual and legal determination" regarding the exact point at which Santana became a political committee and therefore did not make any determination that he violated section 9-9.5. Santana argues that an order of an administrative agency must contain findings to make judicial review of its decision possible. See Shallow v. Police Board, 60 Ill. App. 3d 113, 376 N.E.2d 1025 (1978) (record on appeal contained neither the recommendation of the hearing officer, the findings of the police board, nor that board's final decision).

As noted above, this court reviews the decision of an administrative agency based on the entire record. AFM Messenger, 198 Ill. 2d at 394, 763 N.E.2d at 281; Younge v. Board of Education, 338 Ill. App. 3d 522, 788 N.E.2d 1153 (2003) (on review, appellate court may affirm an agency's decision on any basis appearing in the record, regardless of the agency's reasoning). Accordingly, the salient issue is whether sufficient grounds exist in the record to justify the Board's ultimate decision.

Santana's reliance on Shallow is misplaced. The record before this court includes the transcript of public hearings and documentary evidence, the report and recommendation of the hearing officer, the transcript of proceedings before the Board, and its findings and orders, which incorporate the Board's final decision. As such, the record is more than sufficient to support the Board's decision and to aid in our review.

For all of the reasons stated herein, we affirm the decision of the Board.

Affirmed.

NEVILLE, and MURPHY, J.J., concur.