JOHN VILLARREAL, Plaintiff-Appellant, v. THE VILLAGE OF SCHAUMBURG *et al.*, Defendants-Appellees.

First District (6th Division)   No. 1—01—0960

Opinion filed October 19, 2001.

Schenk, Duffy, McNamara, Phelan, Carey & Ford, Ltd., of Joliet (Thomas P. Polacek, of counsel), for appellant.

Seyfarth Shaw, of Chicago (R. Theodore Clark, Jr., Robert C. Long, and James J. Powers, of counsel), for appellees.

JUSTICE GALLAGHER delivered the opinion of the court:
This action was brought by plaintiff, John Villarreal, seeking an

order of *mandamus* requiring defendants, the Village of Schaumburg, village manager Kenneth Fritz and director of human resources Darold Pitzer, to provide plaintiff with health insurance coverage at defendants' expense pursuant to the Illinois Public Safety Employee Benefits Act (820 ILCS 320/1 *et seq.* (West 1998)) (the Act), and to reimburse him for any health insurance costs and medical expenses incurred following his retirement due to a duty-related disability. Plaintiff now appeals an order of the trial court granting defendants' motion for summary judgment and denying plaintiff's motion for summary judgment. We affirm.

## BACKGROUND

The relevant facts are undisputed. Plaintiff was employed as a police officer by the Village of Schaumburg police department from July 1, 1981, until he was given a disability retirement pension on December 23, 1999. On May 28, 1989, plaintiff responded to a call for assistance and was kicked in the knee during his arrest of a suspect. As a result, plaintiff's knee cartilage and ligaments were seriously damaged, and he also suffered a broken leg. Due to his injury, plaintiff was off work for approximately one year, during which time he underwent surgery and physical therapy. Plaintiff returned to a light duty desk assignment and eventually returned to full duty as a police officer. Plaintiff remained on full duty for the next 10 years.

On July 9, 1999, plaintiff suffered a second injury to his knee. The second injury resulted from plaintiff's response to a report of home invasion and his pursuit of the suspect. During the pursuit, plaintiff jumped down a drop of approximately four feet and felt his knee give out. Plaintiff again underwent surgery and physical therapy. Ultimately, however, as a result of his 1999 injury, the village police pension board (the Board) concluded that plaintiff was fully disabled from serving on the police department so as to qualify him for retirement from service. On December 23, 1999, the Board granted plaintiff a duty-related disability pension of 65% of his salary. Plaintiff is currently self-employed and owns a small contracting business, Villarreal Construction.

On December 30, 1999, plaintiff wrote a letter to defendant Pitzer requesting free health insurance coverage for himself and his family pursuant to the Act. Pitzer denied the request based upon his conclusion that plaintiff was not eligible for the benefits because his injury was not a "catastrophic injury," which is required under the Act.

## ANALYSIS

### I. Standard of Review

We first address our appropriate standard of review. It is well

established that in order to qualify for the issuance of a writ of *mandamus*, the following requirements must be met: a plaintiff must show a clear, affirmative right to the requested relief, a clear duty of the defendant to act, and clear authority in the defendant to comply with the writ. *Noyola v. Board of Education of the City of Chicago*, 179 Ill. 2d 121, 133, 688 N.E.2d 81, 88 (1997); *Orenic v. Illinois State Labor Relations Board*, 127 Ill. 2d 453, 467-68, 537 N.E.2d 784 (1989); *Senn Park Nursing Center v. Miller*, 104 Ill. 2d 169, 182, 470 N.E.2d 1029 (1984). "Where *** public officials have failed or refused to comply with requirements imposed by statute, the courts may compel them to do so by means of a writ of *mandamus*, provided that the requirements for that writ have been satisfied." *Noyola*, 179 Ill. 2d at 132, 688 N.E.2d at 86.

■ *Mandamus* is not a writ of right but, rather, an extraordinary remedy that is awarded only in the exercise of sound judicial discretion according to legal principles. *League of Women Voters v. County of Peoria*, 121 Ill. 2d 236, 242, 520 N.E.2d 626, 629 (1987). In view of this discretion on the part of the trial court, its decision to grant or deny *mandamus* generally will be reversed on appeal only when it is against the manifest weight of the evidence. See, *e.g., People ex rel. Braver v. Washington*, 311 Ill. App. 3d 179, 186, 724 N.E.2d 68, 73 (1999). In the instant case, however, the trial court's decision did not involve the weighing of evidence or the exercise of discretion. Rather, the procedural posture of the instant case is an appeal from a grant of summary judgment. The reviewing court applies a *de novo* standard of review to summary judgment orders. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 607 N.E.2d 1204 (1992). Both parties assert, and this court agrees, that there is no disputed issue of material fact in the present case. Where there is no genuine issue of material fact, the sole function of a reviewing court is to determine whether the trial court's judgment was correct as a matter of law. *Cates v. Cates*, 156 Ill. 2d 76, 78, 619 N.E.2d 715, 716 (1993). Moreover, as we shall discuss further, this case involves construction of a statute. It is well established that statutory construction is a question of law to be decided by the reviewing court without deference to the judgment of the trial court. *Advincula v. United Blood Services*, 176 Ill. 2d 1, 12, 678 N.E.2d 1009, 1015 (1996). The *de novo* standard of review is proper in this case. *Lucas v. Lakin*, 175 Ill. 2d 166, 170, 676 N.E.2d 637, 640 (1997). That is the standard of review that this court shall use, but we believe it would be useful to further address our rationale for applying a *de novo* standard of review.

■ In support of the applicability of a *de novo* standard, defendants cite *Overend v. Guard*, 98 Ill. App. 3d 441, 443-44, 424 N.E.2d 731,

733 (1981). But the *Overend* court merely explained that a trial court's *misinterpretation* of a statute or constitutional provision under which a petitioner seeks *mandamus* is not an "act of discretion to which courts of review will defer." *Overend,* 98 Ill. App. 3d at 443-44, 424 N.E.2d at 733; see also *Mid-America Television Co. v. Peoria Housing Authority,* 93 Ill. App. 3d 314, 319, 417 N.E.2d 210, 214 (1981) (explaining that "[w]here the order of the trial court is based on a misinterpretation of the applicable law, it must be concluded that the denial of a writ of *mandamus* \*\*\* was not based on a sound exercise of judicial discretion"). While we agree with the *Overend* and *Mid-America* courts that a misinterpretation of a statute is not an act of sound judicial discretion, we believe that a more exact statement of the law is that *any* interpretation of a statute or constitutional provision under which a petitioner seeks *mandamus* is not an act of discretion to which courts of review will defer. Indeed, a conclusion that a trial court has misinterpreted a statute or, for that matter, correctly interpreted a statute, necessarily involves a prefatorial statutory construction by the reviewing court. In such instances, the usual deferential standard applied in *mandamus* cases is extraneous and no recourse to it is required. Therefore, where a trial court's decision to deny or grant a petition for *mandamus* turns solely on the construction of a statute, which is a question of law, review is *de novo. Cf. People v. Studio 20, Inc.,* 314 Ill. App. 3d 1000, 1004-05, 733 N.E.2d 451, 454 (2000) (noting that although, generally, courts review the propriety of the trial court's grant of a preliminary injunction under an abuse of discretion standard, to the extent that the ruling was based on the trial court's construction of a statute, a reviewing court may resolve the issue as a matter of law using a *de novo* standard of review); *Tim Thompson, Inc. v. Village of Hinsdale,* 247 Ill. App. 3d 863, 871, 617 N.E.2d 1227, 1234 (1993) ("where the nonmoving party is under no obligation to prove its case, it logically follows that the standard of proof cannot be operative"); see also *Medina v. Air-Mite Devices, Inc.,* 161 Ill. App. 3d 502, 509, 515 N.E.2d 770, 774 (1987) (noting that manifest weight of the evidence is supportive of a determination that has been made by the trier of fact, but it has no bearing on court's review of summary judgment).

## II. The Public Safety Employee Benefits Act

■ We now consider whether plaintiff is clearly entitled to the continuation of health insurance coverage for himself and his family at the expense of defendant Village of Schaumburg, pursuant to the Act. Our analysis necessarily begins with the language of the statute. *In re C.N.,* 196 Ill. 2d 181, 210, 752 N.E.2d 1030, 1047 (2001). The relevant section of the Act provides as follows:

"§ 10. Required health coverage benefits.

(a) An employer who employs a full-time law enforcement, correctional or correctional probation officer, or firefighter, who, on or after the effective date of this Act suffers a catastrophic injury or is killed in the line of duty shall pay the entire premium of the employer's health insurance plan for the injured employee, the injured employee's spouse, and for each dependent child of the injured employee until the child reaches the age of majority or until the end of the calendar year in which the child reaches the age of 25 if the child continues to be dependent for support or the child is a full-time or part-time student and is dependent for support. The term 'health insurance plan' does not include supplemental benefits that are not part of the basic group health insurance plan. If the injured employee subsequently dies, the employer shall continue to pay the entire health insurance premium for the surviving spouse until remarried and for the dependent children under the conditions established in this Section. ***

\* \* \*

(b) In order for the law enforcement, correctional or correctional probation officer, firefighter, spouse, or dependent children to be eligible for insurance coverage under this Act, the injury or death must have occurred as the result of the officer's response to fresh pursuit, the officer or firefighter's response to what is reasonably believed to be an emergency, an unlawful act perpetrated by another, or during the investigation of a criminal act. Nothing in this Section shall be construed to limit health insurance coverage or pension benefits for which the officer, firefighter, spouse, or dependent children may otherwise be eligible." 820 ILCS 320/10 (West 1998).

The issue before this court is whether plaintiff's injury is a "catastrophic injury" under the Act. This is a case of first impression.

### III. Definition of "Catastrophic Injury"

#### A. Ordinary and popularly understood meaning

■ Section 10(a) of the Act does not define "catastrophic injury." A term that is undefined in a statute must be given its ordinary and popularly understood meaning. *Gem Electronics of Monmouth, Inc. v. Department of Revenue*, 183 Ill. 2d 470, 477-78, 702 N.E.2d 529, 533 (1998). The term "catastrophe" is ordinarily understood to mean "a momentous tragic usu[ally] sudden event marked by effects ranging from extreme misfortune to utter overthrow or ruin." Webster's Third New International Dictionary 351 (1986). The term "catastrophic" is ordinarily understood to mean, in terms of an illness, "financially ruinous." Webster's Third New International Dictionary 351 (1986).

Thus, the plain meaning of the term "catastrophic injury" in section 10(a) refers to an injury that is financially ruinous. A "catastrophic injury," which contemplates a ruinous impact on an individual's finances, does not encompass plaintiff's knee injury. It is undisputed that plaintiff's injury has not rendered him incapable of engaging in *any* gainful employment. Although plaintiff has experienced a loss of stability and flexibility in his knee, it is undisputed that the injury would not prevent plaintiff from engaging in a wide variety of occupations, ranging from a building code inspector to a security guard. Plaintiff has admitted that he has continued the general supervision and management of his construction business after his knee injury, and even performs light construction work around the construction site. In the context of the Act, the mere fact that plaintiff currently cannot perform the duties of a police officer does not qualify his injury as "catastrophic."

B. Meaning of "catastrophic injury" in the context of the statute

Although we have determined that plaintiff's injury was not "catastrophic" within the plain and ordinary meaning of the term, we shall address plaintiff's argument that the term "catastrophic injury" was intended to cover a range of injuries. As support for his argument, plaintiff notes that the dictionary definition of "catastrophe" includes the descriptive phrase "marked by effects *ranging* from extreme misfortune to utter overthrow or ruin." (Emphasis added.) Webster's Third New International Dictionary 351 (1986). Plaintiff contends that the plain meaning of the words used in the Act clearly contemplates coverage of the facts of the instant case, because the premature retirement of an 18-year veteran police officer required to permanently retire from his chosen career as a result of an injury constitutes extreme misfortune which falls within the range described by the dictionary definition.

Assuming *arguendo* that the descriptive phrase's reference to a range renders the term "catastrophic" questionable, plaintiff's argument fails. The doctrine of *noscitur a sociis* provides that the meaning of questionable words or phrases should be defined in the context of associated words or phrases. *Z.R.L. Corp. v. Great Central Insurance Co.*, 156 Ill. App. 3d 856, 859, 510 N.E.2d 102, 104 (1987). In the instant case, the legislature used the words "suffers a catastrophic injury or is killed" in section 10(a). 820 ILCS 320/10(a) (West 1998). Thus, even if it were questionable, the meaning of "catastrophic injury" can be ascertained by reference to the words associated with it—"or is killed." In this context, the term "catastrophic injury" refers to an injury of such serious consequence to make it just short of

getting killed. Plaintiff's injury does not approach this level of seriousness.

C. Other jurisdictional definitions of "catastrophic injury"

We are mindful our decision requires no further resort to extrinsic aids of statutory construction for interpretive guidance. See, *e.g., Michigan Avenue National Bank v. County of Cook*, 191 Ill. 2d 493, 504, 732 N.E.2d 528, 535 (2000) (statutory language must be given its plain and ordinary meaning, and, where the language is clear and unambiguous, applied without resort to further aids of statutory construction). Because, however, this is a case of first impression in Illinois, we believe it is beneficial to briefly look at the term "catastrophic injury" as it has been defined by other jurisdictions.

A federal statute entitled the Public Safety Officers' Benefits Act of 1976 (42 U.S.C. § 3796 *et seq.* (1994)) provides monetary benefits to injured or deceased law enforcement officers and firefighters. Pursuant to the federal statute, under certain circumstances, certain benefits are provided to an officer who is disabled "as the direct result of a catastrophic injury sustained in the line of duty." 42 U.S.C. § 3796(b) (1994). The federal statute further provides that " 'catastrophic injury' means consequences of an injury that permanently prevent an individual from performing any gainful work." 42 U.S.C. § 3796(b)(1) (1994). This definition is consistent with the plain and commonly understood meaning of "catastrophic injury" we have discussed.

The State of Florida has enacted a statute that requires any employer of a firefighter who suffers a "catastrophic injury" in the line of duty to pay the entire premium of the employer's health insurance plan. Fla. Stat. Ann. § 112.191(g) (West Supp. 2001). The term "catastrophic injury" is defined as that found in the definition section of Florida's workers' compensation law, which provides, in pertinent part:

> " 'Catastrophic injury' means a permanent impairment constituted by:
>
> (a) Spinal cord injury involving severe paralysis of an arm, a leg, or the trunk;
>
> (b) Amputation of an arm, a hand, a foot, or a leg involving the effective loss of use of that appendage;
>
> (c) Severe brain or closed-head injury *** [;]
>
> (d) Second-degree or third-degree burns of 25 percent or more of the total body surface or third-degree burns of 5 percent or more to the face and hands;
>
> (e) Total or industrial blindness[.]" Fla. Stat. Ann. § 440.02(37) (West Supp. 2001).

Workers' compensation laws in at least two other states have also explicitly defined "catastrophic injury." The definition found in the Florida workers' compensation law discussed above is the same as that in Georgia's workers' compensation law. See Ga. Code Ann. § 34—9—200.1(g) (1998). North Dakota's workers' compensation statute defines "catastrophic injury" as including, *inter alia*, paraplegia, quadriplegia, severe closed head injury, total blindness in both eyes, or amputation of an arm or leg. N.D. Cent. Code § 65—05.1—06.1(2)(c) (1995). It is noteworthy that in these instances where a legislature has chosen to supply the definition of "catastrophic injury," none of these definitions included the knee injury that plaintiff here suffered.

## CONCLUSION

We conclude that plaintiff did not suffer a "catastrophic injury" under the Act and is not entitled to the health insurance benefits provided thereunder. In accordance with the foregoing, we affirm the trial court's judgment in its entirety.

Affirmed.

O'BRIEN and O'MARA FROSSARD, JJ., concur.