EMERALD CASINO, INC., f/k/a HP, Inc., Plaintiff-Appellant, v. ILLINOIS GAMING BOARD *et al.*, Defendants-Appellees (The Village of Rosemont, Intervenor).

First District (2nd Division)   Nos. 1—02—2309, 1—02—2716, 1—02—2825 cons.

Opinion filed December 30, 2003.—Rehearing denied February 18, 2004.

20

CAHILL, J., dissenting.

Kevin M. Forde and Joanne R. Driscoll, both of Kevin M. Forde, Ltd., of Chicago, for appellant.

Lisa Madigan, Attorney General, of Chicago (Gary Feinerman, Solicitor General, and Mary E. Welsh, Assistant Attorney General, of counsel), for appellees.

Robert M. Stephenson, David B. Goroff, John L. Rogers, Therese C. King, and Jason Bent, all of Foley & Lardner, of Chicago, for intervenor.

PRESIDING JUSTICE WOLFSON delivered the opinion of the court:

The law is clear: "shall" means shall, except when it doesn't.

In this case we must decide what the legislature meant when it used "shall" in a 1999 amendment to the Riverboat Gambling Act (Act) (230 ILCS 10/1 *et seq.* (West 2000)). The answer to that question determines whether the amendment tells the Illinois Gaming Board (Board) it must grant Emerald Casino, Incorporated's (Emerald) application to renew its license and relocate its gambling business to Rosemont.[1]

FACTS

Illinois's Riverboat Gambling Act authorizes the Board to issue 10 licenses for riverboat gambling, the first four of them for gambling on the Mississippi River. 230 ILCS 10/7(e) (West 2002). In 1992, the Board issued one of the Mississippi River licenses to HP, Incorporated, now known as Emerald Casino. The license was renewed for one year in 1995 and again in 1996.

In April 1997, Emerald applied for a license renewal; however, instead of remaining on the Mississippi, Emerald wanted to relocate to Rosemont. The Board refused Emerald's application two months later. Emerald pursued an administrative appeal. While the administrative appeal was pending in July 1997, Emerald stopped operating its casino.

The administrative law judge (ALJ) issued an order agreeing with the Board's denial. The ALJ denied both of Emerald's motions for reconsideration.

Before Emerald's administrative appeal went back to the Board, the legislature added section 11.2 to the Act, effective June 25, 1999. 230 ILCS 10/11.2(a) (West 2002). In part, the section reads as follows:

"(a) A licensee that was not conducting riverboat gambling on January 1, 1998[,] may apply to the Board for renewal and approval of relocation to a new home dock location authorized under section 3(c) and the Board shall grant the application and approval upon receipt by the licensee of approval from the new municipality

---

[1]Most people who aren't lawyers think "shall" has a mandatory meaning. The dictionary, for example, defines "shall," when addressed to another, as "determination, compulsion, obligation, or necessity." Webster's Deluxe Unabridged Dictionary 1666 (2d ed. 1979). Certainly, the biblical injunctions that until recently graced the rotunda of the Alabama supreme court building ordinarily are not thought of as suggestions.

or county, as the case may be, in which the licensee wishes to relocate pursuant to section 7(j)." 230 ILCS 10/11.2(a) (West 2002). Only Emerald fit that description, then and now.

Once section 11.2(a) passed, the Board declared the ALJ's previous order moot and allowed Emerald to file a new application for renewal and relocation under the new section. On July 7, 1999, the board of trustees of Rosemont approved Emerald's request to dock in Rosemont. Emerald submitted its revised application to the Board on September 24, 1999.

On January 30, 2001, the Board announced its intent to deny Emerald's request for renewal and relocation. On March 6, 2001, the Board issued its written notice of denial in addition to a five-count disciplinary complaint seeking to revoke Emerald's existing license. Emerald requested a hearing on the denial of its application and answered the Board's disciplinary complaint. The record provides no specific reason why the revocation proceedings linger without resolution.

On May 21, 2001, Emerald filed a complaint in the circuit court of Cook County seeking declaratory relief and a writ of *mandamus* ordering the Board to approve Emerald's application for renewal and relocation. Subsequently, the parties filed cross-motions for summary judgment, disputing whether the Board had the authority to deny Emerald's application even though Emerald met the two criteria set forth in section 11.2(a) of the Act.

Before the trial court ruled on the summary judgment motions, the Village of Rosemont (Rosemont) filed an emergency motion to intervene and join Emerald's motion for summary judgment. The trial court granted summary judgment in favor of the Board and denied Emerald's motion for summary judgment. The court did not address Rosemont's motion to intervene.

Rosemont filed a renewed motion to intervene. Rosemont also filed a motion requesting the court to vacate the previous summary judgment order and grant summary judgment in favor of Emerald based on the legislative history of section 11.2(a). The trial court granted Rosemont's request to intervene, but denied the motion to vacate its previous order.

Emerald and Rosemont now appeal the orders granting the Board summary judgment. We reverse and remand.

DECISION

I. Standard of Review

■ Generally, a trial court's decision to deny declaratory relief or a

writ of *mandamus* will not be disturbed on appeal unless it is against the manifest weight of evidence. *Villarreal v. Village of Schaumburg*, 325 Ill. App. 3d 1157, 1160, 759 N.E.2d 76 (2001); see *State Farm Fire & Casualty Co. v. Leverton*, 314 Ill. App. 3d 1080, 1083, 732 N.E.2d 1094 (2000). However, this appeal arises from a grant of summary judgment. "In all cases involving summary judgment, we review the evidence in the record *de novo.*" *West American Insurance Co. v. J.R. Construction Co.*, 334 Ill. App. 3d 75, 80, 777 N.E.2d 610 (2002) (applying *de novo* standard when reviewing summary judgment that denied declaratory relief); see also *Villarreal*, 325 Ill. App. 3d at 1160 (conducting *de novo* review of summary judgment denying writ of *mandamus*).

II. Procedural Issues

There are three procedural issues that must be addressed. They are directed to whether this court should entertain this appeal.

The first issue was raised by this court during oral argument. We asked whether there has been a sufficient determination by the Board to warrant judicial consideration. That is, since there was no final Board action, is there a controversy "ripe for adjudication"? See *Bio-Medical Laboratories, Inc. v. Trainor*, 68 Ill. 2d 540, 545-46, 370 N.E.2d 223 (1977).

The Board contends we have no jurisdiction to proceed, relying entirely on *National Marine, Inc. v. Illinois Environmental Protection Agency*, 159 Ill. 2d 381, 639 N.E.2d 571 (1994). The issue in *National Marine* was whether the circuit court properly dismissed National Marine's complaint challenging the Illinois Environmental Protection Agency's (EPA) issuance of a section 4(q) (Ill. Rev. Stat. 1991, ch. 111½, par. 1004(q)) notice that informed the plaintiff it may be potentially liable for a release of a hazardous substance. The court, observing that the section 4(q) notice was only the first step in a long enforcement proceeding that might never take place, held the plaintiff's complaint was premature and was correctly dismissed. That is, "[p]laintiff's complaint request[ed] [the] court to render an advisory opinion concerning future events." *National Marine*, 159 Ill. 2d at 390. In addition, the preenforcement judicial review of the section 4(q) notice issuance "would completely undermine the statutory scheme established by the General Assembly as well as the legislative purpose of the Act." *National Marine*, 159 Ill. 2d at 391. The court did not use the word "jurisdiction" anywhere in its opinion.

We do not see how *National Marine* has much to do with this case, where we are called on to determine whether the legislature imposed a mandatory duty on the Board when it enacted section 11.2(a). No

further investigation need take place. The Board, when it issued a notice of denial on March 6, 2001, more than 17 months after Emerald's application was filed, made clear its belief section 11.2(a) grants it discretion to refuse Emerald's application or to delay it to death. All we have to do in this appeal is read the statute for legislative intent. We know how to do that.

■ There is a basic rationale for the ripeness doctrine as it relates to judicial intervention in administrative actions:

> " 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.' " *Bio-Medical Laboratories*, 68 Ill. 2d at 546, quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148-49, 18 L. Ed. 2d 681, 691, 87 S. Ct. 1507, 1515 (1967).

In *Bio-Medical Laboratories*, the Director of the Illinois Department of Public Aid (Department) had informed the plaintiff he intended to forthwith suspend it from the public aid program. The Department's auditors agreed, but the Department had not acted. The court found "a sufficient final determination to warrant judicial consideration." *Bio-Medical Laboratories*, 68 Ill. 2d at 546.

Relying on *Bio-Medical Laboratories*, the court in *Alternative Fuels, Inc. v. Director of the Environmental Protection Agency*, 337 Ill. App. 3d 857, 864, 786 N.E.2d 1063 (2003), *appeal allowed*, 205 Ill. 2d 575 (2003), held an agency's threat of action that could prove detrimental to a party may warrant judicial consideration. There, the EPA issued a violation notice to Alternative Fuels, Incorporated, threatening prosecution if the company did not comply with permit procedures. Ripe enough for judicial consideration of a declaratory judgment, held the court.

We were faced with a ripeness challenge in *Peoples Energy Corp. v. Illinois Commerce Comm'n*, 142 Ill. App. 3d 917, 492 N.E.2d 551 (1986). There, the circuit court granted injunctive relief and a declaratory judgment that stopped the Illinois Commerce Commission (Commission) from asserting its authority to halt a planned corporate reorganization of Peoples Energy. The Commission had begun a hearing, but gave no indication of how long the proceedings would take. We held the issues were clearly defined, not abstract or hypothetical, sufficiently ripe for judicial action. *Peoples Energy*, 142 Ill. App. 3d at 934.

■ We find the straightforward issue of legislative intent now placed before us is clearly defined and ripe for decision. If section

11.2(a) imposes a mandatory duty on the Board, a legislative directive is being ignored. Emerald does not seek a review of any discretionary decisions or Board findings. Deciding this case would not undermine the General Assembly's statutory scheme—it would explicate it. This is fertile ground for *mandamus* and declaratory judgment action.

The second procedural issue is the Board's contention on appeal that Emerald is barred from seeking relief from the courts because it failed to exhaust its administrative remedies.

■ Emerald claims the Board waived the exhaustion issue when it failed to raise it in the trial court. It did not. An appellee, the Board in this case, may urge the exhaustion issue on appeal, even though not directly ruled on by the trial court, " 'so long as the factual basis for such point was before the trial court.' " *Beahringer v. Page*, 204 Ill. 2d 363, 370, 789 N.E.2d 1216 (2003), quoting *Shaw v. Lorenz*, 42 Ill. 2d 246, 248 (1969). We will consider the exhaustion issue.

■ There are three basic reasons for requiring a litigant to exhaust administrative remedies before seeking judicial review: (1) exhaustion allows full development of the facts before the agency; (2) it allows the agency an opportunity to use its expertise; and (3) the aggrieved party may succeed before the agency, rendering judicial review unnecessary. *Illinois Bell Telephone Co. v. Allphin*, 60 Ill. 2d 350, 358, 326 N.E.2d 737 (1975).

There are established exceptions to the exhaustion doctrine. The doctrine is not a bar to judicial determination when the issue "is one of statutory and case law interpretation, and therefore it falls within the scope of our particular expertise and not the State Board's." *Office of the Cook County State's Attorney v. Illinois Local Labor Relations Board*, 166 Ill. 2d 296, 306, 652 N.E.2d 301 (1995); see also *Getto v. City of Chicago*, 77 Ill. 2d 346, 356-57, 396 N.E.2d 544 (1979) (circuit court properly exercises jurisdiction when "[t]he sole issue presented here is one of statutory interpretation, and there is no question which requires the [agency's] expertise").

Determining the scope of an agency's power and authority is a judicial function, not a question for the agency itself to answer. *County of Knox ex rel. Masterson v. Highlands, L.L.C.*, 188 Ill. 2d 546, 554, 723 N.E.2d 256 (1999). In addition, exhaustion is not required where the administrative remedy is inadequate or futile, or where the litigant will be subjected to irreparable injury due to lengthy administrative procedures that fail to provide interim relief. *Peoples Energy*, 142 Ill. App. 3d at 932; see also *General American Realty Co. v. Greene*, 107 Ill. App. 3d 1011, 1014-15, 438 N.E.2d 540 (1982).

In fact, if the Board has no authority to do anything other than fulfill a legislative directive, its refusal to do so does not constitute a

decision subject to administrative review. See *McCoy v. Stackler*, 38 Ill. App. 3d 1012, 1015, 350 N.E.2d 197 (1976); see also *People ex rel. Simpkins v. Village of Kincaid*, 26 Ill. App. 2d 68, 167 N.E.2d 698 (1960) (*mandamus* is proper remedy where village's board did not have discretion to refuse to issue permits).

■ The exceptions are a firm fit in this case—no facts to develop before the agency, not a matter for use of agency expertise, an issue of statutory and case law interpretation, lengthy procedures that cause substantial harm to the applicant, and a clear signal from the agency that exhausting administrative remedies would be patently useless. See *Beahringer*, 204 Ill. 2d at 378; *Village of Maywood Board of Fire & Police Commissioners v. Department of Human Rights*, 296 Ill. App. 3d 570, 577, 695 N.E.2d 873 (1998) (exhaustion not required where issue of statutory interpretation, not fact, was presented, no agency expertise was involved, and irreparable harm would result from further pursuit of administrative remedies). Exhaustion was not necessary in this case.

●7 Finally, the Board contends summary judgment was proper because Emerald's action in the trial court was untimely. The Board says Emerald should have sought declaratory relief immediately after the legislature enacted section 11.2(a) in June 1999, instead of waiting until the Board denied the renewal and relocation application in 2001. The Board fails to support its position with pertinent legal authority or persuasive reasons. Nor can we find any of either. We reject the Board's contention that Emerald's complaint was untimely.

We conclude Emerald has chosen the correct remedies in pursuit of its claim of entitlement. Declaratory judgment is an appropriate method for determining controversies relating to construction or interpretation of a statute. *Office of the Lake County State's Attorney v. Illinois Human Rights Comm'n*, 200 Ill. App. 3d 151, 155, 558 N.E.2d 668 (1990). As for *mandamus*, if Emerald is right about the meaning of "shall," it has a "clear right to the relief requested," there is a "clear duty of the respondent to act," and there is "clear authority in the respondent to comply with the writ." *Cf. Noyola v. Board of Education of the City of Chicago*, 179 Ill. 2d 121, 133, 688 N.E.2d 81 (1997).

It is time to consider the merits of Emerald's view of section 11.2(a).

III. Statutory Interpretation

The dispute in this case centers on section 11.2(a)—the Board "shall grant the application" for renewal and relocation of a license after approval by the new locality. 230 ILCS 10/11.2(a) (West 2002). If

"shall" is directory, the statute gives the Board the discretion it claims. If it is mandatory, no discretion. The license issues.

■ When interpreting a statute, a court must ascertain and give effect to the intent of the legislature. *Palos Community Hospital v. Illinois Health Facilities Planning Board*, 328 Ill. App. 3d 336, 339, 765 N.E.2d 1187 (2002). If possible, the proper way to determine the legislature's intent is to apply the plain meaning of the statute's language. *Midstate Siding & Window Co. v. Rogers*, 204 Ill. 2d 314, 320, 789 N.E.2d 1248 (2003).

■ Generally, "shall" indicates a mandatory intent. *People v. O'Brien*, 197 Ill. 2d 88, 93, 754 N.E.2d 327 (2001). However, the word's meaning is not fixed or inflexible, and courts sometimes interpret it as directory. *Andrews v. Foxworthy*, 71 Ill. 2d 13, 21, 373 N.E.2d 1332 (1978); *Brennan v. Illinois State Board of Elections*, 336 Ill. App. 3d 749, 759, 784 N.E.2d 854 (2002). The meaning of "shall" is "grounded on the 'nature, objects and the consequences which would result from construing it one way or another.' " *Andrews*, 71 Ill. 2d at 21, quoting *Carrigan v. Illinois Liquor Control Comm'n*, 19 Ill. 2d 230, 233, 166 N.E.2d 574 (1960). That is, when a statute prescribes the performance of an act by a public official or a public body, "the question of whether it is mandatory or directory depends on its purpose." *Andrews*, 71 Ill. 2d at 21. Here, as we examine a sampling of the cases, we keep in mind the legislature's "purpose" in enacting section 11.2(a).

A. Cases interpreting "shall" as mandatory

Some decisions interpret "shall" as mandatory because the statute was directed at more than technicalities of official proceedings.

For example, in *Pace v. Regional Transportation Authority*, 346 Ill. App. 3d 125, 139 (2003), the statute stated the Regional Transportation Authority Board (RTA) "shall approve" a proposed Pace budget if it met the listed criteria. The court held "shall" was mandatory, even though the statute did not contain any consequences for the RTA's failure to follow it. *Pace*, 346 Ill. App. 3d at 140.

In *Simmons v. DuBose*, 142 Ill. App. 3d 1077, 1080, 492 N.E.2d 586 (1986), the Election Code said a candidate's name "shall not appear on the ballot if the requirements for filing nominating petitions are not satisfied." Because the purpose of the statute was to guard against fraud and unfairness to other candidates, and was not a mere technicality, the court held the direction was mandatory. *Simmons*, 142 Ill. App. 3d at 1081.

Some decisions interpret "shall" as mandatory to protect a right or benefit. For example, in *People v. Jennings*, 3 Ill. 2d 125, 128, 119 N.E.2d 781 (1954), a section of the Revenue Act of 1939 (Ill. Rev. Stat.

1949, ch. 120, par. 584) stated "the appropriate officer 'shall publish the assessment of personal property in full' in some public newspaper on or before July 10." The court held the purpose of the provision was to protect taxpayers and not merely to guide tax officials in their duties. Therefore, "shall" was mandatory. *Jennings*, 3 Ill. 2d at 130-31.

*Jennings* was relied on in *Andrews*, where the Revenue Act stated the supervisor of assessments "shall publish" certain information regarding assessed properties on or before a certain date. The court held the publication requirement was mandatory because the legislative purpose was to benefit and protect taxpayers. *Andrews*, 71 Ill. 2d at 20-21.

In *Citizens Organizing Project v. Department of Natural Resources*, 189 Ill. 2d 593, 596-97, 727 N.E.2d 195 (2000), the plaintiff requested fees in accord with the statute that said: "In any case in which a party has any administrative rule invalidated by a court for any reason ***, the court shall award the party bringing the action the reasonable expenses of litigation, including attorney's fees" (5 ILCS 100/10—55(c) (West 1998)). The court held a mandatory reading of "shall" best served the purpose of the statute—to encourage parties to challenge invalid administrative rules. *Citizens Organizing Project*, 189 Ill. 2d at 598-99.

Legislative desire to protect a citizen's rights and benefits required mandatory readings of "shall" in *Newkirk v. Bigard*, 109 Ill. 2d 28, 34, 485 N.E.2d 321 (1985) (mining board order integrating mineral rights "shall" provide an unwilling interest owner alternatives to participating in the costs and risks of drilling or mining); *Cole v. Department of Public Health*, 329 Ill. App. 3d 261, 263-65, 767 N.E.2d 909 (2002) (Water Well and Pump Installation Contractor's License Act (225 ILCS 345/16 (West 2000)) provided the Public Health Department "shall" notify a license holder of a revocation hearing within 10 days of the hearing and allow the holder an opportunity to be heard); and *Armstrong v. Hedlund Corp.*, 316 Ill. App. 3d 1097, 1107, 738 N.E.2d 163 (2000) (Wage Act (820 ILCS 115/5 (West 1998)) specified employer "shall" pay final compensation on the day of an employee's separation "if possible").

Whether the legislature intended "shall" to be mandatory can be viewed in light of the words used in other parts of the statute. In *People v. O'Brien*, 197 Ill. 2d 88, 92-93, 754 N.E.2d 327 (2001), the court examined the Illinois Vehicle Code (625 ILCS 5/3—707 (West 1998)), deciding "[n]o person shall operate a motor vehicle unless the motor vehicle is covered by a liability insurance policy" created an absolute liability offense.

Where the meaning of an amendment to a statute is in issue, as is

true in this case, "circumstances surrounding the enactment must be considered." *People v. Woodard*, 175 Ill. 2d 435, 449, 677 N.E.2d 935 (1997). In *Woodard*, an amended section of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1977, ch. 38, par. 110—14) provided: "Any person incarcerated on a bailable offense who does not supply bail and against whom a fine is levied on conviction of such offense shall be allowed a credit of $5 for each day so incarcerated upon application of the defendant." *Woodard*, 175 Ill. 2d at 440. The State contended the defendant could not seek the credit on appeal because he did not ask for it in the trial court. The court, after examining the purpose of the amendment, held the *per diem* credit was a mandatory right and the defendant could apply for it on appeal. *Woodard*, 175 Ill. 2d at 457-58; see also *People v. Youngbey*, 82 Ill. 2d 556, 561, 413 N.E.2d 416 (1980) (statute stating "[a] defendant shall not be sentenced for a felony before a written presentence report of investigation is presented to and considered by the court" (Ill. Rev. Stat. 1977, ch. 38, par. 1005—3—1) was intended to be mandatory and could not be waived by the defendant, the purpose of the section being to provide the trial judge with complete information).

B. Cases interpreting "shall" as directory

Here, too, an examination of legislative purpose is the central inquiry. Many of the decisions concern the Election Code. See 10 ILCS 5/1 *et seq.* (West 2002).

In *People ex rel. Harris v. Powell*, 35 Ill. 2d 384, 386, 221 N.E.2d 274 (1966), the Election Code (Ill. Rev. Stat. 1965, ch. 46, par. 9—5) provided the chairmen of the county central committees "shall file" calls for the conventions of their respective parties. The court held the words "shall file" were directory, there being no claim the failure to file a call would adversely affect the merits of the election. *Powell*, 35 Ill. 2d at 387.

In *People ex rel. Meyer v. Kerner*, 35 Ill. 2d 33, 36, 219 N.E.2d 617 (1966), a section of the Election Code (Ill. Rev. Stat. 1965, ch. 46, par. 8—13) setting out a requirement that 90 days before a primary "the Representative committee of each political party shall meet, and by resolution fix and determine the number of candidates to be nominated by its party" was held directory in the absence of fraud or a showing the merits of the election were affected.

Where the Election Code (10 ILCS 5/9—21 (West 2000)) provided "the Board shall render its final judgment within 60 days of the date the complaint is filed," a decision made after 60 days was held valid in *Brennan v. Illinois State Board of Elections*, 336 Ill. App. 3d 749, 759, 784 N.E.2d 854 (2002). One reason for holding the statute was direc-

tory was that a mandatory interpretation would frustrate the nature and purpose of the Election Code—to ensure fair elections. *Brennan*, 336 Ill. App. 3d at 759-60.

*Courtney v. County Officers Electoral Board*, 314 Ill. App. 3d 870, 873, 732 N.E.2d 1193 (2000), dealt with an Election Code requirement that a petition of candidacy "shall" consist of a statement of candidacy, candidate's statement containing the oath, and petition sheets, bound together. Courtney's failure to file his statement of candidacy with his petition sheets was not fatal to his candidacy, the court holding the provision was directory. *Courtney*, 314 Ill. App. 3d at 876; see also *Ballentine v. Bardwell*, 132 Ill. App. 3d 1033, 1036, 478 N.E.2d 500 (1985) (Election Code's simultaneous filing requirement was directory: the provision did not contain a result that would follow if the requirement was not met).

A provision of the Buisness Corporation Act of 1983 was in issue in *Advanced Imaging Center of Northern Illinois Ltd. Partnership v. Cassidy*, 335 Ill. App. 3d 746, 781 N.E.2d 664 (2002), *appeal allowed*, 203 Ill. 2d 543, 788 N.E.2d 727 (2003). The section provided that where shareholders failed to agree on the value of shares owned, "the 'court, upon application of any party, shall stay the proceeding under subsection (a) and shall determine the fair value of the petitioner's shares.' " (Emphasis omitted.) *Advanced Imaging*, 335 Ill. App. 3d at 749, quoting 805 ILCS 5/12.56(f)(6) (West 2000). The court held the statute was directory; a mandatory interpretation would not further its purpose—to enlarge the court's discretionary power under the Act. *Advanced Imaging*, 335 Ill. App. 3d at 749-50.

Decisions examining the meaning of "shall" in the Juvenile Court Act turn on the purpose of the Act—to correct, not punish, juvenile criminal behavior. In *In re Armour*, 59 Ill. 2d 102, 103, 319 N.E.2d 496 (1974), the statute provided an adjudicatory hearing "shall be set within 30 days of the filing of a delinquency petition" (Ill. Rev. Stat. 1971, ch. 37, par. 704—2). The court held the provision was directory. The same result in *In re Pryor*, 111 Ill. App. 3d 851, 853, 444 N.E.2d 763 (1982), where the court held a directory meaning was intended by a provision that required: "[t]he State shall serve upon the minor written notice of intention to prosecute under the provisions of this section simultaneously with the filing of any delinquency petition" (Ill. Rev. Stat. 1979 Supp., ch. 37, par. 705—12(b)).

Interpreting the use of "shall" in statutes pertaining to criminal cases, our courts consider whether a mandatory reading would violate the constitutional principle of separation of powers. To save constitutionality, "shall" was held to be directory in *People v. Flores*, 104 Ill. 2d 40, 46-48, 470 N.E.2d 307 (1984) (where defendant in a criminal

trial wilfully absents himself from court for two successive days, "the court shall proceed with trial" (Ill. Rev. Stat. 1977, ch. 38, par. 115—4.1)); *People v. Davis*, 93 Ill. 2d 155, 157, 442 N.E.2d 855 (1982) (the trial judge "shall specify on the record the particular evidence, information, factors" and "shall set forth his reasons" for imposing the particular sentence (Ill. Rev. Stat. 1979, ch. 38, pars. 1005—4—1(c), 1005—8—1(b)); and *People v. Cox*, 136 Ill. App. 3d 623, 625, 483 N.E.2d 422 (1985) (if the court determines a Post-Conviction Hearing Act petition is frivolous or patently without merit, "it shall dismiss the petition in a written order specifying the findings of fact and conclusions of law it made in reaching its decision" (Ill. Ann. Stat., ch. 38, par. 122—2.1(a) (Smith-Hurd Supp. 1985))).

When determining the meaning of "shall," courts often base their decisions on whether someone's private rights or interests are at stake. For example, in *Carrigan v. Illinois Liquor Control Comm'n*, 19 Ill. 2d 230, 232, 166 N.E.2d 574 (1960), a section of the Liquor Control Act of 1934 provided when a licensee files an application for rehearing of a revocation finding, the Commission "shall receive and consider such application for a rehearing within twenty (20) days from the filing thereof" (Ill. Rev. Stat. 1957, ch. 43, par. 154). The court held the provision was directory because the licensee's rights were not injured by the board's failure to act within 20 days. *Carrigan*, 19 Ill. 2d at 235-36. And in *Cooper v. Hinrichs*, 10 Ill. 2d 269, 272, 140 N.E.2d 293 (1957), the court held the child's best interests required a discretionary reading of the statute that provided: "The court in entering a decree of adoption shall, whenever possible, give custody through adoption to a petitioner or petitioners of the same religious belief as that of the child" (Ill. Rev. Stat. 1953, ch. 4, par. 4—2).

C. Cases interpreting "shall" as mandatory and directory

Construing the Post-Conviction Hearing Act, courts have interpreted "shall" as both mandatory and directory. In *People v. Ross*, 339 Ill. App. 3d 580, 582, 791 N.E.2d 171 (2003), we examined a section of the Post-Conviction Hearing Act which provides that " '[w]ithin 90 days after the filing and docketing of each petition the court shall examine such petition and enter an order thereon pursuant to this Section.' 725 ILCS 5/122—2.1(a)(1) (West 2000)." We held that provision was mandatory. Then we examined section 122—2.1(a)(2) (725 ILCS 5/122—2.1(a)(2) (West 2000)), which provides an order of dismissal "shall be served upon the petitioner by certified mail within 10 days of its entry." *Ross*, 339 Ill. App. 3d at 584. We held that provision was directory. See also *People v. Porter*, 122 Ill. 2d 64, 84-85, 521 N.E.2d 1158 (1988) (90-day time limit for first-stage dismissal was

mandatory, but requirement that trial court "shall" specify findings of fact and conclusions of law in a written order is directory).

## IV. The Meaning of "Shall" in This Case

■ We conclude the legislature meant "shall" to be mandatory, not directory, when it enacted section 11.2(a). These are our reasons.

### A. The purpose of the amendment

We look to the " 'essence of the thing to be done.' " *People v. Cox*, 136 Ill. App. 3d 623, 626, 483 N.E.2d 422 (1985), quoting 1A A. Sutherland, Statutory Construction § 25.03, at 300 (1984). We understand "the question of whether it is mandatory or directory depends on its purpose." *Andrews*, 71 Ill. 2d at 21. When we consider the meaning of a statutory amendment, we consider the circumstances surrounding the enactment, as well as the need for the amendment and the purpose it serves. *Woodard*, 175 Ill. 2d at 444.

As demonstrated by the dissent in this case, section 11.2(a) is capable of being understood by reasonably well-informed persons in two or more different ways (*People v. Jameson*, 162 Ill. 2d 282, 288, 642 N.E.2d 1207 (1994)), so we consider the statute's legislative history and Emerald's history in the gambling casino business at the time section 11.2(a) was enacted.

In June 1999, Emerald was the only one of 10 licensees not conducting riverboat gambling. By then, the Board had refused Emerald's April 1997 application for renewal of license and relocation to Rosemont. Emerald had stopped operating its casino in July 1997. Emerald's administrative review languished until May 5, 1999, when an administrative law judge agreed with the Board's refusal. Legislative debate on proposed section 11.2(a) began later in May, leading to enactment of the amendment.

Section 11.2(a) applies only to Emerald. It does not fit any other licensee. It is clear in the legislative discussions that lawmakers knew they were dealing only with Emerald, the tenth license, "sitting unused." 91st Ill. Gen. Assem., House Proceedings, May 21, 1999, at 206 (statements of Representative Brunsvold).

> "Scott: Okay. And so, when the bill refers to a licensee that wasn't conducting riverboat gambling, you're talking about the East Dubuque license.
> Brunsvold: One license.
> Scott: Okay.
> Brunsvold: We're talking about one license." 91st Ill. Gen. Assem., House Proceedings, May 21, 1999, at 206 (statements of Representatives Scott & Brunsvold).

In addition, the Illinois Attorney General had issued a formal opinion stating Emerald could not relocate its license away from the Mississippi. 1995 Ill. Att'y Gen. Op. No. 95—011. Rosemont had agreed to accept the Emerald casino back in 1997, and it was still waiting for Board approval.

We cannot construe a statute in a way that deprives it of legislative purpose. One obvious purpose of the amendment was to resurrect the tenth license after nearly two years of inactivity, to begin producing much-needed revenue for the state, as well as meeting the Act's stated purpose of "assisting economic development and promoting Illinois tourism." 230 ILCS 10/2(a) (West 1998).

If the legislature intended "shall" to mean "may," nothing much, if anything, would have been accomplished by the amendment. It was obvious the Board was not disposed kindly toward Emerald's application for renewal and relocation. It had been pending for two years and two months, the Board rejecting it at every opportunity, including denial of two motions for reconsideration, before a final ruling could be made. Then came section 11.2(a), effective June 25, 1999. The application process started again, but this time Emerald was armed with the new statute, along with Rosemont's invitation, the prerequisite for Board approval.

We believe that when the legislature chose to enact a statute that applied only to Emerald it thought it was providing a remedy for a moribund license, not creating yet another round of delay and rejection. Our supreme court reached a similar conclusion in *Fumarolo v. Chicago Board of Education*, 142 Ill. 2d 54, 566 N.E.2d 1283 (1990), where the question was whether the mayor was required to choose board members from a slate presented by the nominating commission. The statute: " '[T]he commission *shall* submit to the mayor a slate of 3 different candidates for each vacant or new board position ***. *** [T]he mayor *shall* select one of the 3 candidates as board member from the slate.' " (Emphasis added and in original.) *Fumarolo*, 142 Ill. 2d at 95, quoting Ill. Rev. Stat. 1989, ch. 122, par. 34—3.1.

The court held the mayor must choose from the Board's slate. No discretion. Before the statute was amended, the mayor had complete discretion in appointing Board members. If the legislature intended the mayor to retain that discretion, said the court, a nominating commission would not have been necessary. "We will not assume that the legislature engaged in a meaningless act." *Fumarolo*, 142 Ill. 2d at 97. Neither will we.

The Board suggests a mandatory reading of the amendment might invite an attack on the grounds that section 11.2(a) runs afoul of the constitutional prohibition of special legislation. But that has not been

made an issue for us to decide. Our task is to determine legislative intent, not legislative wisdom. "It is the dominion of the legislature to enact laws and it is the province of the courts to construe those laws." *Shields v. Judges' Retirement System of Illinois*, 204 Ill. 2d 488, 497, 791 N.E.2d 516 (2003).

The Board reminds us it has a duty to protect the public from unsavory and duplicitous licensees. So it has, a duty imposed on it by the legislature when it enacted the Riverboat Gambling Act. Nothing in section 11.2(a) prevents the Board from moving to revoke Emerald's license. In fact, the Board began revocation proceedings on March 6, 2001, obviously with something less than dispatch. The May 1999 legislative debates show us the legislature did not intend to tinker with the Board's authority to revoke Emerald's license:

> "Moore, A: I guess, what I'm trying to determine because the Gaming Board's authority is so restricted in 11.2. I mean *they are told that they have to issue the license.*
>
> Brunsvold: That's all.
>
> Moore, A: However ...
>
> Brunsvold: This is after the license is issued.
>
> Moore, A: ... if the terms of the Act are not complied with, completely, then the Gaming Board does have the authority to revoke the license.
>
> * * *
>
> Brunsvold: Any *** violation of this act can be *** grounds for revocation of the license.
>
> Moore, A: And that will be the Gaming Board's authority?
>
> Brunsvold: Exactly." (Emphasis added.) 91st Ill. Gen. Assem., House Proceedings, May 21, 1999, at 221-22 (statements of Representatives Moore & Brunsvold).

We are aware of the "deeply rooted" principle that statutory language should not be construed to produce an absurd result. *People v. Hanna*, 207 Ill. 2d 486 (2003). But there is no point to concocting hypothetical scenarios of absurdity in this case. The legislature knew what the result of its amendment would be—renewal and relocation for a licensee who had held a license since 1992, had operated a gambling casino in Illinois for nearly five years, and had received one-year renewals of that license in 1995 and 1996. Emerald was not an unknown quantity or a new entity. Wise or not, good policy or not, there was nothing absurd about it. It was time to put the license to work. We do not stop to question the legislature's judgment when it enacted section 11.2(a). "Under our system of government, courts may not rewrite statutes to make them consistent with their own ideas of orderliness and public policy." *Lawrence v. Regent Realty Group, Inc.,*

197 Ill. 2d 1, 11, 754 N.E.2d 334 (2001), citing *People v. Wright*, 194 Ill. 2d 1, 29, 740 N.E.2d 755 (2000).

The claim of absurdity was made and rejected in *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 57 L. Ed. 2d 117, 98 S. Ct. 2279 (1978). There, the Secretary of the Interior, following the terms of the Endangered Species Act, stopped the near completion of the Tellico Dam and declared the area the critical habitat of the snail darter. The Court affirmed the decision of the Secretary:

"Concededly, this view of the Act will produce results requiring the sacrifice of the anticipated benefits of the project and of many millions of dollars in public funds. But examination of the language, history, and structure of the legislation under review here indicates beyond doubt that Congress intended endangered species to be afforded the highest of priorities." *Tennessee Valley Authority*, 437 U.S. at 174, 57 L. Ed. 2d at 134, 98 S. Ct. at 2292.

We believe our conclusion is consistent with the cases we have cited. To summarize, we make three observations.

First, most importantly, legislative purpose, considered in light of history and circumstances, is affirmed by our reading of section 11.2(a). *Cf. Woodard*, 175 Ill. 2d at 444.

Second, this is not the kind of situation reflected in the decisions that hold a statutory "shall" is directory. That is, section 11.2(a) does not require a public officer or body to do or not do something within a particular period of time. *Cf. Brennan*, 336 Ill. App. 3d 749. The amendment does not rest on mere technicalities. *Cf. Simmons*, 142 Ill. App. 3d 1077. A directory reading is not required by some societal interest. *Cf. In re Armour*, 59 Ill. 2d 102. This is not a case where legislative purpose would be frustrated by a mandatory reading. *Cf. Advanced Imaging*, 335 Ill. App. 3d 746. Nor is the constitutional separation of powers doctrine at issue. *Cf. Flores*, 104 Ill. 2d 40.

Third, a mandatory reading protects the rights and benefits the legislature intended to extend to Emerald. *Cf. Newkirk*, 109 Ill. 2d 28.

B. The wording of the amendment

The Board is correct when it says a mandatory reading of "shall" in section 11.2(a) would create an exception to the license renewal requirements of section 7 of the Act (230 ILCS 10/7 (West 2002)). The question for us is whether that is what the legislature intended to do when it added section 11.2(a). Generally, when the legislature uses certain words in one instance and different words in another, different results were intended. *Costello v. Governing Board of Lee County Special Education Ass'n*, 252 Ill. App. 3d 547, 558, 623 N.E.2d 966 (1993). Here, section 11.2(a) consists of one sentence. The words

"may" and "shall" are separated by 23 words. The legislature used "may" for the nonoperating licensee's authority to apply for renewal and relocation, and it used "shall" for the Board's obligation to grant the application. That indicates a purposeful selection of words.

In addition, section 11.2(a) refers specifically to sections 3(c) and 7(j) of the Act, but makes no reference to section 7(g), a seeming rebuttal to the Board's claim that the legislature could not have intended to disregard standards for renewal and relocation contained in other parts of the Act.

We also note the legislature twice used "shall" in section 11.2(b) of the Act when establishing requirements for levels of minority and female ownership. It is apparent to us that there is nothing permissive about those requirements. Section 11.2(b) was enacted at the same time as section 11.2(a).

C. Legislative debates

Parsing legislative debates is a risky business. Here, each side finds some solace in the debates. Probably the most telling exchange took place during the questioning of Representative Brunsvold, the House sponsor:

"Scott: Okay. Well, there's language, and I believe it's Section 11.2, that says that, 'the Gaming Board shall grant the application.' It doesn't sound like they have much, as much authority there.

Brunsvold: As long as they follow the regulations and the license pathway to obtaining that license, yes, then the Gaming Board will approve it.

Scott: The Gaming Board will approve it. So, if they meet those two conditions that you talked about, then the Gaming Board has to approve it.

Brunsvold: Yes. Yes." 91st Ill. Gen. Assem., House Proceedings, May 21, 1999, at 208 (statements of Representatives Scott & Brunsvold).

The statements of a bill's sponsor matter when discerning legislative intent. *Illinois Federation of Teachers v. Illinois Educational Labor Relations Board*, 278 Ill. App. 3d 954, 959, 664 N.E.2d 107 (1996).

CONCLUSION

Accordingly, we reverse the trial court's order granting the Board's motion for summary judgment, reverse the trial court's order denying Emerald and Rosemont's motion for summary judgment, and remand to the circuit court with instructions to enter summary judgment in

favor of Emerald and Rosemont and proceed in accordance with this opinion.

Reversed and remanded with directions.

BURKE, J., concurs.

JUSTICE CAHILL, dissenting:
I respectfully dissent from the majority's conclusion that exhaustion of remedies does not apply in this case. The flaw I see in the majority opinion is a failure to distinguish between an agency's clear power to construe a statute it is charged with administering, and its lack of power to construe its own statute in such a way that exceeds its authority.

It is not a fair reading of Illinois law to say that whenever the question is one of pure statutory construction, with no issues of fact involved, the circuit court may entertain a declaratory judgment action to construe the statute. If that were the case, the exception would devour the rule. Whenever a party felt aggrieved by an agency's anticipated interpretation of a statute it is charged with administering, the party could abandon administrative review in mid-course and seek a declaratory judgment to correct the agency's anticipated blunder. That is, in fact, what happened here.

A party to an administrative proceeding may always file a declaratory judgment action challenging the "jurisdiction" or authority of the administrative agency to render an anticipated decision. See *County of Knox ex rel. Masterson v. Highlands, L.L.C.*, 188 Ill. 2d 546, 553, 723 N.E.2d 256 (1999) (defining an agency's "jurisdiction" to include an element of statutory authority). If the agency is without authority, the court may proceed. If, on the other hand, the agency has the authority to make the decision, the failure to exhaust administrative remedies must result in the dismissal of the action and remand to the agency. Here, neither the majority nor the circuit court asked the question: Does the Illinois Gaming Board (Board) have the authority to decide the meaning of section 11.2(a) of the Riverboat Gambling Act (the Act) (230 ILCS 10/11.2(a) (West 2002))? A review of the majority's own citations makes clear that our supreme court has invoked a "pure statutory construction" exception only when the ultimate issues in the case turn on the authority of the agency to make the challenged interpretation.

In *Knox County*, the court applied the statutory construction exception where the agency's authority to define a hog facility under the Counties Code (55 ILCS 5/1—1001 *et seq.* (West 1998)) was at-

tacked. *Knox County*, 188 Ill. 2d 546. At issue was whether a hog facility fell within the "agricultural purposes" exemption from zoning regulation. *Knox County*, 188 Ill. 2d at 556. Our supreme court intervened to block the zoning board's anticipated interpretation after finding, in reliance on the plain meaning of "agricultural purposes" gleaned from sources outside the Counties Code, that the phrase could never be construed to give the board authority to regulate a hog facility. *Knox County*, 188 Ill. 2d at 556-57.

Similarly, in *Office of the Cook County State's Attorney v. Illinois Local Labor Relations Board*, 166 Ill. 2d 296, 652 N.E.2d 301 (1995), the court set aside the exhaustion rule where the anticipated interpretation of the Illinois Public Labor Relations Act (5 ILCS 315/1 *et seq.* (West 1992)) by the Labor Relations Board would place assistant State's Attorneys within the board's authority to regulate. At issue was whether assistant State's Attorneys were nonmanagerial employees entitled to engage in collective bargaining. *Cook County*, 166 Ill. 2d at 300. The court found the board's expertise was not implicated because the issue could be resolved by relying on the statute granting power to the State's Attorney and case law describing the position of the assistant State's Attorney. *Cook County*, 166 Ill. 2d at 305-06. The court concluded that assistant State's Attorneys were managerial employees as a matter of law, and that the board would exceed its authority if it found otherwise. *Cook County*, 166 Ill. 2d at 302.

The court in *Getto v. City of Chicago*, 77 Ill. 2d 346, 396 N.E.2d 544 (1979), concluded the exhaustion rule did not apply where the agency lacked authority to grant the relief requested by the aggrieved party. The plaintiff sought to enjoin collection of an invalid tax by the City of Chicago. *Getto*, 77 Ill. 2d at 352. The court held exhaustion would not provide the plaintiff with an adequate remedy because the Illinois Commerce Commission, while having authority to grant a refund, lacked authority to suspend the tax. *Getto*, 77 Ill. 2d at 356-57.

These cases do not support application of the statutory construction exception here, where the statute under consideration is one that the Board administers and its anticipated interpretation, while arguably incorrect, does not implicate the Board's "jurisdiction" or authority under the statute. It is undisputed that the Board is charged with the exclusive jurisdiction to administer the Act, including section 11.2(a). It is also undisputed that the Board has "jurisdiction" or authority to consider and ultimately grant or deny an application under section 11.2(a). The precise issue is whether the Board has discretion to deny an application where the applicant has shown: (1) it was not conducting riverboat gambling on January 1, 1998; and (2)

there has been approval from the municipality or county in which the applicant wishes to relocate. As the majority points out, this is an issue involving the construction of section 11.2(a). But this is also an issue that involves the Board's particular expertise to construe its own statute. See *People ex rel. Birkett v. City of Chicago*, 202 Ill. 2d 36, 48-49, 779 N.E.2d 875 (2002). The statutory construction exception to the exhaustion rule does not fit under these facts.

I also find troubling the majority's alternative finding that exhaustion would be futile and cause Emerald Casino, Inc. (Emerald), substantial harm. The majority has not explained, nor does the record indicate, the basis for this conclusion. Even assuming there were clear indications that the Board would ultimately deny Emerald's application, this is not enough to avoid the exhaustion requirement. See *Castaneda v. Illinois Human Rights Comm'n*, 132 Ill. 2d 304, 328, 547 N.E.2d 437 (1989). While Emerald suggests that the Board is dragging its feet and has shown it intends to delay a decision "to death," these allegations are conclusory. It is unfair to say that the Board has delayed action in deciding Emerald's application where there has been an ongoing investigation into alleged misconduct by Emerald. The Board has the right under the Act to suspend or revoke a license as it sees fit. 230 ILCS 10/5(11), (15) (West 2002). Nothing in the Act directs the Board to address an application for renewal and relocation under section 11.2(a) *before* revocation is addressed.

While I believe this case should have been dismissed in the circuit court on exhaustion principles, I will comment briefly on the majority's analysis of section 11.2(a). The majority opinion assumes that the interpretation of section 11.2(a) turns on the meaning of the word "shall." Of course "shall" means "shall." But our inquiry does not end there. We must consider "shall" in context, and decide what our legislature intended when it said the "Board shall grant the *application*." (Emphasis added.) 230 ILCS 10/11.2(a) (West 2002). To avoid an absurd result, "application" should be construed to mean an application free from substantive defects enumerated in the Act. If an admitted convicted felon filed an application under section 11.2(a), the Board has a statutory (and perhaps under their oath as Board members, a constitutional) duty to deny the application. Under Emerald's analysis, with which the majority agrees, the Board must disregard this duty and award the license. The majority dismisses this absurd result with a vague reference to a case involving snail darters. Citing only the legislative history (and conceding that "each side finds some solace in the debates"), the majority concludes that the Board must grant Emerald's license without regard to the regulatory provisions of the Act. 346 Ill. App. 3d at 36-37. This cannot be what the legislature intended.

In fact, the legislature codified its intent in section 2 of the Act, saying: "While authorization of riverboat gambling will enhance investment, development and tourism in Illinois, it is recognized that it will do so successfully only if public confidence and trust in the credibility and integrity of the gambling operations and the regulatory process is maintained." 230 ILCS 10/2(b) (West 2002). To serve this purpose, the "regulatory provisions of this Act are designed to strictly regulate the facilities, persons, associations and practices related to gambling operations." 230 ILCS 10/2(b) (West 2002).

A reading of section 11.2(a) that does not offend the express legislative intent is one that interprets "shall" to mean "shall" but only where the application complies with all other provisions of the Act. These provisions require a truthful, candid application from anyone seeking a gaming license in Illinois. As summarized by the Board in its motion to dismiss Emerald's complaint, Emerald's application was defective in the following ways:

"(1) Emerald failed to truthfully and accurately disclose the facts and circumstances surrounding Emerald's selection of Rosemont as its relocation site;

(2) Emerald failed to truthfully and accurately disclose the facts and circumstances surrounding various meetings between Emerald management and prospective Emerald shareholders, including Marvin Davis and Richard Duchossois;

(3) Emerald failed to truthfully and accurately disclose the degree of involvement of Kevin Flynn in various Emerald activities;

(4) Emerald failed to truthfully and accurately disclose certain agreements relating to the construction of a casino in Rosemont and ownership interests in Emerald; and

(5) Emerald failed to conduct usual and customary due diligence regarding any prospective shareholders, resulting in, among other problems, Emerald and Donald Flynn entering into agreements to sell shares in Emerald to individuals who are associated with persons who have been identified as members and associates of organized crime."

I cannot believe it was the intent of the legislature that a request for renewal and relocation of a gaming license based on an application saddled with these allegations must be granted by the Board before those allegations are aired and resolved. The reading mocks the heightened scrutiny built into the Act and casts a cloud over an industry that the legislature clearly intended to be closely regulated.

The order of the circuit court should be reversed and the case remanded with directions to dismiss the complaint.